OPINION
{¶ 1} The appellant, Kelli Tuttle (n.k.a. "Kelli Gleason"), appeals the June 10, 2003 judgments of the Common Pleas Court, Juvenile Division, of Hancock County, Ohio, granting permanent custody of her three children, Clayton Tuttle, Morgan Vance, and Logan Vance, to Hancock County Job and Family Services-Child Protective Services Unit ("CPSU") and terminating her parental rights and responsibilities.
 {¶ 2} On May 22, 2002, the juvenile court issued three ex parte orders to remove Clayton, Morgan, and Logan from their parents' care and to place these children in the emergency temporary custody of CPSU. At this time, Jason was responsible for the children, and Kelli was in jail. The following day, complaints were filed, alleging that the children were neglected and dependent. Thereafter, a probable cause hearing was held, and the court determined that probable cause existed for the continued removal of the children from their parents' care. The court then granted temporary custody of the children to CPSU.
 {¶ 3} An adjudicatory hearing was held on June 26, 2002, and the trial court found that all three children were neglected and dependent. In addition, a case plan for the children was submitted to the court at this hearing. This plan was signed by both Kelli Tuttle and the children's father, Jason Vance, and was filed in the record. Thereafter, a dispositional hearing was held on the matter on August 1, 2002. At that time, the trial court continued the temporary custody of the children with CPSU and adopted the case plan for the children. Approximately six months later, on February 10, 2003, CPSU filed a motion for permanent custody of the children. On June 4 and 6, 2003, a hearing was held on CPSU's motion for permanent custody. Shortly thereafter, the trial court granted the motion and terminated the parental rights and responsibilities of Kelli Tuttle and Jason Vance to their children, Clayton, Morgan, and Logan. This appeal followed, and Kelli[1] now asserts one assignment of error.
The lower court erred to the prejudice of the appellant by granting theC.P.S.U.'s motion for permanent custody when the case plan services werenot reasonably implemented.
 {¶ 4} Our review of this issue begins by noting "[i]t is well recognized that the right to raise a child is an `essential' and `basic civil right.'" In re Hayes (1997), 79 Ohio St.3d 46, 48, citing In reMurray (1990), 52 Ohio St.3d 155, 157. Thus, "a parent's right to the custody of his or her child has been deemed `paramount'" when the parent is a suitable person. In re Hayes, supra (citations omitted); In reMurray, supra. Because a parent has a fundamental liberty interest in the custody of his or her child, this important legal right is "protected by law and, thus, comes within the purview of a `substantial right[.]'" Inre Murray, supra. Based upon these principles, the Ohio Supreme Court has determined that a parent "must be afforded every procedural and substantive protection the law allows." In re Hayes, supra (citation omitted). Thus, it is within these constructs that we now examine the assignment of error.
 {¶ 5} In her sole assignment of error, Kelli maintains that the trial court erred in granting permanent custody to CPSU because CPSU did not use reasonable and diligent efforts to reunify the children with her. Specifically, Kelli contends that CPSU did not extend services to her once she was incarcerated in January of 2003. We find this argument to be without merit.
 {¶ 6} Once a child has been placed in the temporary custody of a children's services agency, the agency is required to prepare and maintain a case plan for that child. R.C. 2151.412(A)(2). Further, R.C.2151.412(E)(1) states that "[a]ll parties, including the parents * * * are bound by the terms of the journalized case plan." One of the enumerated goals of a case plan for a child in the temporary custody of a children's services agency is "[t]o eliminate with all due speed the need for the out-of-home placement so that the child can safely return home." R.C. 2151.412(F)(1)(b). This goal is commonly referred to as reunification.
 {¶ 7} However, once an agency files a motion for permanent custody, the Revised Code requires that the trial court determine, by clear and convincing evidence, that a grant of permanent custody to the agency that has so moved is in the best interest of the child and that one of four enumerated factors applies. R.C. 2151.414(B)(1). Included in this list is that
[t]he child is not abandoned or orphaned or has not been in thetemporary custody of one or more public children services agencies * * *for twelve or more months of a consecutive twenty-two month period endingon or after March 18, 1999, and the child cannot be placed with either ofthe child's parents within a reasonable time or should not be placed withthe child's parents.
R.C. 2151.414(B)(1)(a). In determining whether the child cannot be placed with either parent within a reasonable time or should not be placed with the parents, the Revised Code requires that the court "consider all relevant evidence." R.C. 2151.414(E). This statute further states that "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent[,]" if it finds by clear and convincing evidence that one or more of sixteen enumerated exists. R.C. 2151.414(E).
 {¶ 8} The Supreme Court of Ohio has held that "[c]lear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." Cross v. Ledford (1954), 161 Ohio St. 469, 477, citing Merrick v. Ditzler (1915), 91 Ohio St. 256. In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." Cross, supra (citations omitted). Thus, we are required to determine whether the evidence was sufficient for the trial court to make its findings by a clear and convincing degree of proof.
 {¶ 9} In the case sub judice, the trial court found that permanent custody of the children to CPSU was in the best interests of the children, that the children were not abandoned or orphaned and had not been in the temporary custody of one or more public children services agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and "that the factors listed in Revised Code Section 2151.414(E)(1) have been proven by clear and convincing evidence to exist." This section states:
Following the placement of the child outside the child's home andnotwithstanding reasonable case planning and diligent efforts by theagency to assist the parents to remedy the problems that initially causedthe child to be placed outside the home, the parent has failedcontinuously and repeatedly to substantially remedy the conditionscausing the child to be placed outside the child's home.
R.C. 2151.414(E)(1). In addition, the trial court determined that Kelli was habitually incarcerated, which prevented any meaningful relationship with her children, a factor listed in R.C. 2151.414(E)(13). Thus, the court determined that the children could not be placed with either of their parents within a reasonable time or should not be placed with their parents.
 {¶ 10} Kelli does not assert that the trial court erred in determining the best interests of the children. She solely maintains that the trial court erred in determining that CPSU engaged in reasonable case planning and diligent efforts to assist her in remedying the problems that initially caused her children to be placed outside of her home. Kelli bases this assertion upon the agency's failure to provide her with services since she has been incarcerated or to investigate available prison programs that would comply with the case plan. Thus, we examine the record to determine whether the evidence was sufficient for the trial court to find that CPSU engaged in reasonable case planning and made diligent efforts to reunify the family.
 {¶ 11} The record in these cases reveals the following facts. In February of 2000, CPSU began providing voluntary parent education to Kelli and Jason. However, this ended on April 12, 2001, due to a lack of cooperation by Kelli and Jason. This same service was re-initiated in July of 2001, and continued until January 30, 2002, when it stopped once again because of a lack of cooperation. These sessions involved educating the parents as to how to properly care for a child and to aid in child development. In addition, the need for long-term, stable housing for the children was discussed with Kelli and Jason during these sessions.
 {¶ 12} During this time, the parent educator, Becky Shumaker, noted that when she would visit the home, the children would not have clean diapers, at age three, Clayton was still using a bottle, and that Logan was always in a highchair or his seat, had very little muscle tone in his legs, often had bruises on his face, and was dirty, as was Morgan. Shumaker also witnessed the parents prepare food for themselves but nothing for the children. However, the children would receive an occasional morsel of food from their parents' plates. Shumaker testified that she informed the parents that this was not proper nutrition and told them what they needed to do to ensure that their children were adequately fed. She also told them that Clayton should not be using a bottle and was in need of dental care.
 {¶ 13} On May 21, 2002, Logan Vance, then age fifteen months, was admitted to the hospital for non-organic failure to thrive, which was caused by malnutrition. At that time, Logan weighed fifteen pounds and ten ounces, well below what a properly fed child would be at Logan's age. Logan remained in the hospital for two days and gained nearly two pounds during his stay. In addition, Logan had previously been admitted to the hospital for non-organic failure to thrive in August, 2001. During that hospitalization, Logan's weight increased from ten pounds and five ounces to eleven pounds and four ounces. This hospitalization is what led to the second intervention by CPSU to provide parent education to Kelli and Jason.
 {¶ 14} Following Logan's second hospitalization for non-organic failure to thrive, all three children were removed from their parents' care on May 22, 2001. A case plan was then formulated. The case plan noted that Morgan needed optical care because she suffered from "lazy eye," a condition that can result in blindness if left untreated. In addition, the plan noted that Clayton needed dental care because he had "bottle rot," a condition caused by excessive intake of sugar often as the result of children drinking too much juice and/or soda pop in their bottle. The case plan also noted that the Morgan and Logan had developmental delays. Based on the health concerns regarding the children, the case plan required that they be given the proper medical treatment needed and that Kelli and Jason schedule the necessary appointments, attend these, and follow through with all recommendations and exams. CPSU's role in achieving this objective was to make any necessary referrals, provide information regarding nutrition, aid in assessing the children's conditions, and to assist the parents in understanding and following through with medical recommendations.
 {¶ 15} The case plan also noted that the parents were in need of mental health assessments and therapy and provided that the agency would make referrals to Century Health so that the parents could obtain these assessments. The parents were also to attend parent education sessions, which the agency would provide. The parents were also required to secure proper housing, to provide for the children's other basis needs, educate themselves on proper parenting, and to help their children achieve developmental milestones. To assist in this goal, the aid of the parent educator, Becky Shumaker, was obtained by the agency.
 {¶ 16} Upon their removal from their parents' care, the children were placed in foster care. While in foster care, Logan received proper nutrition, gained weight, and overcame many of his developmental delays. Likewise, Morgan began wearing glasses and an eye patch to correct her vision and overcame many of her developmental delays. In addition, Clayton underwent several oral surgeries to repair his teeth, including capping of some teeth and the extraction of others that were impacted or otherwise unsalvageable. Both the caseworker and Shumaker also testified that the children are now properly fed, well adjusted, happy, and look for their foster parents when injured or in need of some other sort of care rather than their parents even when in the company of Kelli and/or Jason.
 {¶ 17} As for the parents, both received mental health assessments. They were given visitation with the children, and parenting sessions were scheduled. However, both Kelli and Jason were incarcerated at various times during the pendency of this action. In fact, at the time of the permanent custody hearing, Jason was at the Rehabilitation and Opportunity Center ("ROC"), a place where persons who are convicted can serve their sentence but are able to attend counseling and other types of programs, as well as maintain employment. In addition, Kelli was serving an eleven month term of imprisonment with the Ohio Department of Rehabilitation and Correction, to which she was sentenced on January 23, 2003, for six felony counts of forgery, and had committed the offense of passing bad checks even after the children were removed by CPSU.
 {¶ 18} The evidence revealed that even while not incarcerated, Kelli did not regularly attend parenting classes, repeatedly failed to consistently implement the parenting education she was provided, refused to admit that her numerous criminal matters affected her ability to parent her children, and often did not interact with all three children during her visits with them. In addition, only one home visit with Jason and Kelli was ever achieved after the children's removal because the two of them did not maintain stable housing, a problem they had since CPSU first entered their lives in 2000. In fact, the caseworker, the parent educator, and the probation officer for Kelli and Jason testified that they had several addresses, including living in a car and with people in violation of regulations for those receiving government housing. Furthermore, Kelli never scheduled or attended any doctor's appointments for the children.
 {¶ 19} Kelli testified during the trial that she failed to attend various meetings and appointments because she did not have transportation. To the contrary, witnesses for CPSU testified that she and Jason were given "HATS" vouchers, which serve as a means to provide transportation for families involved with CPSU in order to ensure that they have transportation to visitation sessions, counseling, etc. Kelli also testified that she participated in a class entitled "Displaced Homemakers," which includes a group session on parenting, as well as the S.M.A.R.T. program, which involves anger management and stress problems, while incarcerated.
 {¶ 20} Although Kelli provided a letter from her caseworker at the prison that verified her attendance in these classes, no testimony was presented as to how these programs are similar or identical to those considered acceptable by the case plan. Furthermore, Kelli did not provide attendance slips for these programs or information on these programs to Rodney Traxler, the caseworker for CPSU assigned to Kelli's children, until shortly before the permanent custody hearing despite Traxler having told her at the beginning of her latest incarceration to inform him of any programs that she was attending that would comply with the case plan. In addition, no information was provided to Traxler or during the hearing as to Kelli's success in these programs, her ability to actually implement any lessons learned, or her level of completion. Nevertheless, Kelli maintains that CPSU had the responsibility to investigate any available programs and to help her receive these programs or provide her with some sort of alternative.
 {¶ 21} Notably, Kelli has cited no case in support of her proposition that a children's services agency's duty to make reasonable efforts to reunite a parent with his/her children includes the duty to monitor or evaluate a parent's efforts at reunification during a period of incarceration absent contact by the incarcerated parent to make the agency aware of his/her efforts. Our review of the relevant case law has revealed no support for this proposition either. However, after reviewing the efforts of CPSU as previously outlined, we conclude that the trial court did not err in finding that CPSU engaged in reasonable case planning and diligent efforts towards reunification. Given the significant involvement with CPSU both prior to the children's removal and thereafter, Kelli's demonstrated lack of commitment to using the resources offered to her by CPSU, her refusal to consistently put into action the parenting education provided to her, her continuous criminal activity, and the opportunity given to her to inform her caseworker about any programs in which she was involved while incarcerated and to provide information about the nature of these programs, CPSU had no further obligation to provide services to Kelli while she was incarcerated. Accordingly, the assignment of error is overruled, and the judgments of the Common Pleas Court, Juvenile Division, of Hancock County, Ohio, are affirmed.
Judgments affirmed.
WALTERS and CUPP, JJ., concur.
[1] Jason Vance, the children's father, did not appeal the termination of his parental rights and responsibilities.