OPINION
{¶ 1} This appeal is taken from a final judgment of the Geauga County Court of Common Pleas, Juvenile Division. Appellants, Betsy Ross ("Betsy"), her husband Len Ross ("Len"), and their biological minor children, Jordan and James Ross ("Jordan" and "James," respectively), appeal from the juvenile court's judgment granting permanent custody of Jordan and James to appellee, Geauga County Job and Family Services ("GCJFS"). For the reasons set forth below, we affirm the judgment of the juvenile court.
 {¶ 2} R.C. 2151.414 sets forth guidelines that a juvenile court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates that the juvenile court must schedule a hearing, and provide notice, upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.
 {¶ 3} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (1) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (2) the child is abandoned and the parents cannot be located; (3) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (4) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
Therefore, R.C. 2151.414(B) establishes a two-pronged analysis that the juvenile court must apply when ruling on a motion for permanent custody. In practice, the juvenile court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.
 {¶ 4} If the child is not abandoned or orphaned, then the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the juvenile court must consider all relevant evidence before making this determination. The juvenile court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the conditions enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.
 {¶ 5} Assuming the juvenile court ascertains that one of the four circumstances listed in R.C. 2151.414(B)(1)(a) through (d) is present, then the court proceeds to an analysis of the child's best interest. In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates that the juvenile court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.
The juvenile court may terminate the rights of a natural parent and grant permanent custody of the child to the moving party only if it determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency that filed the motion, and that one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present. Clear and convincing evidence is more than a mere preponderance of the evidence; it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. In reHolcomb (1985), 18 Ohio St.3d 361, 368. An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence. In re Jacobs (Aug. 25, 2000), 11th Dist. No. 99-G-2231, 2000 Ohio App. LEXIS 3859, at 11.
 {¶ 6} We review a juvenile court's decision terminating parental rights and responsibilities for an abuse of discretion.Miller v. Miller (1988), 37 Ohio St.3d 71, 74; In reMcDaniel, 11th Dist. Nos. 2002-L-159 and 2002-L-159, 2004-Ohio-2595, at ¶ 24; In re Snow, 11th Dist. No. 2003-P-0080, 2004-Ohio-1519, at ¶ 28. An abuse of discretion connotes more than a mere error of law or judgment; it implies that the court's attitude was arbitrary, unreasonable, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 7} In the instant matter, Jordan was born in 1993, and James was born in 1995. The boys resided in Thompson, Geauga County, with Betsy and Len.
 {¶ 8} On May 28, 2002, a complaint was filed by GCJFS alleging that Jordan and James were neglected and dependent children. GCJFS cited the boys' excessive absence in school and domestic violence issues within their home.
 {¶ 9} Jordan was in second grade. He missed approximately thirty-four days of school, was tardy approximately ten times, and was getting all F's. James was in kindergarten part-time. He missed approximately eighteen days of school and was tardy approximately eight times. With regard to the domestic issues, Jordan talked to his teacher about his parents fighting and at least once got hit in the head with a cassette tape that his mother threw at his father. Both parents pleaded "not true" to the charges.
 {¶ 10} At a hearing on July 12, 2002, the juvenile court adjudicated Jordan and James dependent children pursuant to R.C.2151.04(C) and neglected children pursuant to R.C. 2151.03(A)(2) and (3). The juvenile court then ordered that GCJFS exercise protective supervision over the children.
 {¶ 11} The juvenile court adopted the July 16, 2002 case plan with one addition. The case plan required Betsy and Len to: (1) have a hair analysis test and undergo drug and alcohol assessment if they tested positive for drugs; (2) have mental health assessments and follow the recommendations; and (3) provide a stable environment for the children. The juvenile court added a requirement that both submit to random drug testing.
 {¶ 12} Carol Lee ("Ms. Lee") was appointed as guardian ad litem for the children. In a report dated November 27, 2002, Ms. Lee described her visits at the family home from July 17, 2002 through October 24, 2002. According to Ms. Lee, Betsy stated that their food stamps were cut off, and Len reported that their house was in foreclosure. Len also told Ms. Lee that he earned $800 from an odd job and planned to make a mortgage payment. However, according to Ms. Lee, "they now have two ponies and a goat."
 {¶ 13} Ms. Lee also reported about the condition of the home. She stated, "[t]he sink was off the wall in the bathroom. Betsy stated that one of the children was standing on it. The bathroom was filthy." Ms. Lee added that the home was poorly insulated, and "[t]here are ongoing problems with the electricity both the set up in the house (open fuse boxes, and fires in outlets) and the company shutting it off due to lack of payment. * * * The children have dirty mattresses."
 {¶ 14} Ms. Lee observed that James showed her where he had been shot by his brother with a BB gun. According to Ms. Lee, "[t]he BB had been imbedded but was removed. There was swelling on the skin and it was a pale green." James whispered to Ms. Lee that his father had a high-powered sniper rifle. Len himself reported that he had a sawed-off shotgun, a Deerslayer, and a Mossburg 500.
 {¶ 15} According to Ms. Lee's report, Len and Betsy failed to comply with the case plan. She stated, "Len has demonstrated a complete disregard for the health and safety of his wife and children. He continues to act in a violent matter towards his wife. * * * There have been no drug and alcohol evaluations at this time. Drug items were found in the home. Len reported that he grows marijuana."
 {¶ 16} On October 31, 2002, the juvenile court issued an emergency telephonic order granting GCJFS temporary custody of the children. Len was "* * * reportedly barricaded in the home in a stand off with police agencies. [The] [p]arents were involved in another incident of domestic violence." Len communicated to the Geauga County Sheriff's Department that he was not going to be taken alive, and Betsy left the house through a bathroom window. The Lake County S.W.A.T. team was called, and the incident lasted six hours. Len ultimately surrendered, and the temporary custody order was terminated that same day. When he entered the home, Chief Fowler of the Geauga County Sheriff's Department observed that the home had no heat, a smell from the refrigerator, dog droppings on the floors, and forty to fifty pornographic films behind the parents' bed.
 {¶ 17} Ms. Lee filed a motion to remove the children from the home. At the December 5, 2002 review hearing, the juvenile court also heard Ms. Lee's motion. In a December 12, 2002 judgment entry, the court stated it found "* * * the children's emotional needs are not being met in the current household. There is evidence of domestic violence and flagrant use of drugs in the household. The children's father has demonstrated severe episodes of emotional and mental instability. Both parents have tested positive for drug use, and neither parent has completed the requirement that they complete a drug and alcohol assessment * * * that the condition of the children's home is both unsanitary and unsafe. The parents lack stable employment * * *." The juvenile court ordered the children be placed in the temporary custody of GCJFS.
 {¶ 18} The parents failed to cooperate with the court's order. The day after the hearing, on December 6, 2002, both parents absconded to Ashtabula County with the children. The family could not be located, and the juvenile court issued a bench warrant for the arrest of Betsy and Len. The children were eventually recovered and placed in foster care. The parents' visitation was initially suspended, but visitation was later resumed.
 {¶ 19} The case plan was amended on June 10, 2003. The changes included a requirement that Len complete a psychiatric and mental health assessment as well as a drug and alcohol assessment and follow through with all the recommendations. Betsy was to attend a minimum of two counseling sessions per month, obtain a second drug and alcohol assessment from Lake Geauga Center, and follow through with the recommendations.
 {¶ 20} Betsy and Len's home was foreclosed upon. By July 2003, Betsy and Len had moved into a trailer behind the junkyard of Guaranteed Auto in Thompson, Ohio. They lived there against the wishes of the owners of the property, who reportedly did not know them and contacted the Thompson Run Police Department about the matter.
 {¶ 21} Len began a one-year prison term, for a felony conviction for receiving stolen property, at the Lorain Correctional Institution on September 3, 2003. Thereafter, Betsy was living with her uncle in Geneva-on-the-Lake. At the time of the hearing, Betsy was living between the homes of Len's mother, Sue Mitchell ("Ms. Mitchell"), and a friend in Pennsylvania.
 {¶ 22} The juvenile court held a review hearing on September 5, 2003, and the court indicated that the parents had made little progress in addressing the case plan. Specifically, the juvenile court stated that "[Len] has had numerous encounters with the law during this review period and has recently been sentenced to prison. [Betsy] continued to have regular contact with [Len] up until the time of his incarceration. [Betsy] has had an updated drug and alcohol assessment performed by Lake Geauga Center. Julia McGruder [("Ms. McGruder"), a chemical dependency counselor at Lake Geauga] has expressed to the court an opinion that she does not believe [Betsy] suffers from a drug or alcohol dependency. This court concludes that the evidence strongly suggests otherwise. She continues to test positive for Methamphetamines [sic] and she had continued to have regular contact with her husband who is diagnosed as being dependent upon marijuana and methamphetamines."
 {¶ 23} The court also noted that "[d]uring the review period, [Betsy] has been unable to maintain housing and stable employment. She has been inconsistent in attending counseling." The court stated that the children were doing well in foster care and found that the lack of progress by the parents warranted continued removal of the children.
 {¶ 24} Ms. Lee filed another report, dated November 6, 2003. She reported that the children were doing well in foster care. According to Ms. Lee, Len completed a drug and alcohol assessment, but he did not follow through with the recommendations. As for his psychiatric and mental health assessment, Len failed to show up for his appointment. Betsy, however, failed to complete a second mental health and drug and alcohol assessment, and she also failed to follow through with the recommendations. Further, Betsy had not attended counseling since August 28, 2003. Ms. Lee also reported that both Len and Betsy tested positive for methamphetamines, while Len had also tested positive for amphetamines and marijuana use. Len had started his prison term, and Betsy did not have stable housing.
 {¶ 25} GCJFS moved for permanent custody of the children on September 11, 2003. The juvenile court heard arguments by all parties on November 13 and 14, 2003.
 {¶ 26} Barbara Wiedmann ("Ms. Wiedmann"), a counselor and therapist at Catholic Charities, testified first. She stated that she assessed both children and diagnosed each child with an adjustment disorder. Jordan also had anxiety. Ms. Wiedmann testified that both children wanted the parents to stop arguing.
 {¶ 27} Ms. Wiedmann also assessed Betsy. Ms. Wiedmann testified that she learned of Betsy's reported rape which occurred about February 2002, and she diagnosed Betsy with depression and post-traumatic stress disorder. Ms. Weidman also performed a chemical dependency assessment of Betsy. Although Betsy tested positive for methamphetamine use, Betsy denied using the drug and blamed her positive results on her use of over-the-counter medicines. Betsy did self-report using alcohol and marijuana. Ms. Wiedmann did not testify whether Betsy was chemically dependent.
 {¶ 28} According to Ms. Wiedmann, Betsy "worked through the posttraumatic stress disorder, did very well with that." Ms. Wiedmann added, "[w]e went from posttraumatic stress to depression, decreasing depression. Then we went from that to, I think she said that she wanted to work on becoming more independent in getting things together. But she set that goal and she might have come in once after that." Ms. Wiedmann also worked with Betsy on parenting skills, but that was difficult because Betsy did not have the children.
 {¶ 29} At first, Ms. Wiedmann saw Betsy weekly. "[T]hen [Betsy] started having problems," and Ms. Wiedmann saw her once or twice a month.[1] Ms. Wiedmann last saw Betsy on August 28, 2003. Thereafter, Betsy made appointments, but she had many no shows and missed appointments beginning in September 2003. Ms. Wiedmann described the situation, stating that "[i]n the beginning she did very well [with attendance]. In the end it was a lot of no shows." Ms. Wiedmann added, "[s]he wasn't following through. I could not locate her. I didn't have a phone number or an address. She would call and reschedule but she didn't keep the appointments."
 {¶ 30} On cross-examination, Ms. Wiedmann stated that, because counseling was helping Betsy, the counseling was successful. However, according to her testimony, Betsy "would make progress and then backslide with each crisis." Ms. Wiedmann also stated that she could not think of any reason why Betsy would not be able to parent her children, unless Betsy was using substances. Yet, at the same time, Ms. Wiedmann opined that Betsy did not meet the court's expectations in that she did not have a job or stable housing and did not always have a telephone or a car.
 {¶ 31} Ms. McGruder, a certified chemical dependency counselor at the Lake Geauga Center, also testified. The case plan, as amended on June 10, 2003, required Betsy to receive a second chemical dependency assessment and follow through with the recommendations. Ms. McGruder began assessing Betsy on June 18, 2003. Ms. McGruder found evidence of co-dependency in Betsy, meaning that Betsy was co-dependent on Len, who was chemically dependent. Ms. McGruder testified that she suggested to Betsy that she attend a chemical dependency program at Lake Geauga, but Betsy stated that she would not be able to attend due to transportation problems.
 {¶ 32} Although Betsy reported she had tested positive twice for methamphetamines, Ms. McGruder stated that it was not clear whether Betsy was chemically dependent because Betsy repeatedly denied using methamphetamines. Ms. McGruder testified that Betsy blamed her positive methamphetamine tests on her use of over-the-counter cold medicines, particularly Sudafed. Ms. McGruder, however, did indicate that "there was some question" as to Betsy's chemical dependency.
 {¶ 33} Ms. McGruder also testified that Betsy's thinking was impaired. Ms. McGruder stated, "[s]he appeared to be a victim * * * rarely owned responsibility for what happened to her. * * * It was always someone else's fault." Ms. McGruder met with Betsy a total of five times. Over the course of the summer, Betsy had two no shows, and Ms. McGruder last saw Betsy in an appointment setting on August 27, 2003. Betsy made another appointment for August 28, 2003, but she failed to appear.
 {¶ 34} Ms. McGruder saw Betsy at the September 3, 2003 review hearing and reminded her to make an appointment. Betsy made appointments for October 23, 2003 and November 10, 2003, but she did not show up for either. Between the beginning of her assessment, on June 18, 2003, and the last appointment she appeared for on August 27, 2003, Betsy had two no shows. In total, Betsy had at least five no shows. Importantly, Ms. McGruder admitted that these missed appointments would likely affect her assessment of Betsy's co-dependency, but she would have to see Betsy for an appointment to make an affirmative diagnosis of chemical co-dependency.
 {¶ 35} Lauren Visnick ("Ms. Visnick"), of Omega Laboratories, testified to Betsy and Len's positive drug tests. She stated that Betsy tested positive for marijuana on July 23, 2003, and for methamphetamines on November 21, 2002; April 23, 2003; July 21, 2003; and November 10, 2003. Likewise, Len tested positive for marijuana on July 23, 2003, and for amphetamines and methamphetamines on May 19, 2003. Ms. Visnick also added that use of cold medicines or Sudafed would not affect test results.
 {¶ 36} Deputy William Martin ("Deputy Martin") of the Ashtabula County Sheriff's Department also testified. He stated that he stopped Betsy on October 10, 2003, for a marked lanes violation. He discovered Betsy was driving a leased car which had been due back to its owner the previous month. He asked Betsy to get out of the car, and he noticed a baggie of white powder in the pocket of her coat. The substance tested positive for methamphetamines in a field test. Betsy reported that she did not know how the baggie got there because she borrowed the coat that morning. Deputy Martin arrested Betsy for possession of methamphetamines. Interestingly, Deputy Martin testified that Betsy was wearing the same coat at the final hearing.
 {¶ 37} Blaine Burlingham ("Mr. Burlingham"), a certified chemical dependency counselor with Catholic Charities, testified next. He conducted a drug and alcohol assessment on Len, and he testified that Len was cannabis dependent and appeared paranoid. Mr. Burlingham referred Len to the Lake Geauga Center, where Len saw Bonnie Turner ("Ms. Turner").
 {¶ 38} Ms. Turner, another certified chemical dependency counselor, assessed Len and testified that he presented with psychotic symptoms possibly as a result of methamphetamine use. Len self-reported that he used marijuana and methamphetamines, and he stated that he tolerated twenty dollars of methamphetamines per day. He also reported using marijuana daily. Len began a chemical dependency class at Lake Geauga, but according to Ms. Turner he attended one session and did not follow through with any further treatment.
 {¶ 39} Kathy Glick ("Ms. Glick"), a child and adolescent mental health therapist at Ravenwood Mental Health Center, testified next. She served as James' counselor and testified that she diagnosed James with adjustment order with mixed anxiety and depression. According to Ms. Glick, James worried about whether his parents had heat, electricity, and food and about where he would live. She testified James was doing well in the foster home. He felt safe there and needed the structure the foster parents provided. Ms. Glick also testified that, although James wished to go home to his parents, she did not think James was mature enough to make a rational decision about his best interests.
 {¶ 40} Importantly, Ms. Glick testified that she was not able to interview the parents to learn about James' background because the parents would cancel the appointments and not follow through. Ms. Glick testified that the interview "would have been the first step * * * [t]o show some interest in [the boys'] treatment."
 {¶ 41} Erin Tilbert Plantan ("Ms. Plantan"), an outpatient therapist with Ravenwood Mental Health Center, also testified. She counseled Jordan and testified that she diagnosed Jordan with adjustment disorder with anxiety. She stated that Jordan adjusted well to the foster home, was following rules, getting good grades, and getting along with the family. According to Ms. Plantan, Jordan felt secure there. Although Jordan indicated that he wanted to go home to his parents, Ms. Plantan testified that she did not believe Jordan was mature enough to make that decision.
 {¶ 42} Chief Robert Fowler testified about Len's standoff with police on October 30, 2002, and the condition of the home on that day. The details were described previously.
 {¶ 43} Tia Philllips ("Ms. Phillips") also testified. She worked as a social worker for GCJFS and was assigned to the family. She stated that Betsy and Len were late for about fifty percent of their visitations with the children. According to Ms. Phillips, this worried and frustrated the children.
 {¶ 44} The case was transferred from Ms. Phillips to Julia Dwyer ("Ms. Dwyer"), another caseworker for GCJFS, in April 2003. Ms. Dwyer, like Ms. Phillips, testified that visitation was an issue. According to Ms. Dwyer, Betsy and Len frequently arrived late. Ms. Dwyer stated that the boys would question why their parents were late, and they indicated that it was not fair. Ms. Dwyer also testified that she wrote many letters to Betsy and Len outlining the rules of visitation and the case plan, but the objectives still were not met.
 {¶ 45} Ms. Dwyer noted that as part of her May 2003 review, Len failed to complete his psychiatric evaluation as required by the case plan. She also testified that both Betsy and Len failed to provide verification of their claimed employment. According to Ms. Dwyer, the case plan was amended on June 10, 2003, requiring that Len complete a drug and alcohol assessment and that Betsy complete a second such assessment. However, she stated that both had failed to do so, and she also noted that Betsy was not in counseling in accord with the court's requirement of two times per month. Ms. Dwyer also noted that Betsy continued to test positive for drugs, Len was sentenced to prison, and she was not sure where Betsy was living.
 {¶ 46} Rex Brobst ("Mr. Brobst"), a referral and eligibility specialist caseworker for GCJFS, testified next. His duties included determining eligibility for Medicaid, food stamps, and cash assistance programs. Mr. Brobst testified that he met Betsy but not Len. According to Mr. Brobst, Betsy applied for assistance, but she did not always comply with the program requirements, as assistance required that Betsy participate in the jobs program. Len outwardly refused to participate in the program, and Betsy was given a work experience program assignment, but she did not complete the hours. Mr. Brobst testified that a sanction was placed on the case.
 {¶ 47} Mr. Brobst testified that Betsy was scheduled for a redetermination on July 17, 2002, and then on July 20, 2002, but Betsy did not appear for either appointment. Another appointment was scheduled for September 2002, but at that time food stamps were cut off because Len was receiving unemployment income. Betsy further failed to appear for an assessment on December 10, 2002. Betsy filed another application on June 27, 2003, but did not to show up for her appointment on July 3, 2003. Her application was denied.
 {¶ 48} Dawn Bates ("Ms. Bates"), a kinship navigator for GCJFS, testified next. She conducted a home study for Ms. Mitchell, with whom she ultimately did not recommend placement. According to Ms. Bates, Ms. Mitchell denied knowledge of the drug and alcohol issues of the family as well as that domestic violence occurred in the home. Accordingly, Ms. Bates did not believe Ms. Mitchell would adequately protect the boys from their parents or support them emotionally. It is also worth noting that Ms. Mitchell had a son in prison for murder.
 {¶ 49} Ms. Lee also testified. According to Ms. Lee, it was not in the children's best interest to go home, despite their own wishes. She indicated that she felt that Betsy and Len failed to comply with the case plan and had not made a concentrated effort to comply with it. Ms. Lee testified that Betsy had failed to get her GED and had not taken advantage of the jobs program at GCJFS. Ultimately, she felt that Betsy was unwilling to get a job, establish a home, pay rent and utilities, and provide food and clothing for the boys.
 {¶ 50} Betsy testified next. Betsy testified that the family home was foreclosed upon because she and Len put their money towards Len's $25,000 bond. She stated that she and Len then lived in the trailer next to a scrap yard. After moving out of the scrap yard, Betsy testified that she moved in with her uncle for a few months. She stated that she currently lived with Ms. Mitchell, but she also stayed, at times, with a friend in Pennsylvania. She admitted that Ms. Mitchell was providing for her financially.
 {¶ 51} Betsy testified that she and Len were planning on getting back together and making things work after he is released from prison. Betsy admitted that forty to fifty pornography tapes were in their bedroom in the Thompson home, as was observed by Chief Fowler. Betsy also admitted that from May 2002 to date, she did not have a telephone, and she also testified that she never went to the jobs program provided by GCJFS. Betsy made various excuses as to why did not continue her counseling with Ms. Wiedmann. She often complained about transportation problems getting to visitation or her appointments, but Betsy testified that she was able to obtain rides to visit Len in prison. Betsy also admitted that she did not have a valid driver's license. It is also worth noting that Betsy arrived late for the final hearing.
 {¶ 52} Ms. Mitchell testified last. She stated that she sometimes heard Betsy and Len yelling at each other, but she denied knowing about any domestic problems. According to Ms. Mitchell, Betsy and Len would send the children out of the home so that they could smoke marijuana. Ms. Mitchell was sometimes present at those times, and she would play with the children outside, but she would do nothing about the marijuana.
 {¶ 53} Ms. Mitchell intervened in the matter on the first day of the final hearing, and she requested custody of the children. Although she testified that she did not know of any domestic problems between Betsy and Len, she testified that she would do whatever was necessary to obtain custody of the children, including getting a restraining order against the parents.
 {¶ 54} The juvenile court issued a November 24, 2003 judgment entry, granting permanent custody of the children to GCJFS. In its judgment entry, the juvenile court found, by clear and convincing evidence, that the children were not abandoned and have not been in the temporary custody of a service agency for twelve or more months of a consecutive twenty-two month period. The court further found, by clear and convincing evidence, that the children could not be placed with their parents within a reasonable amount of time and should not be placed with their parents. The court found that, notwithstanding reasonable case planning and diligent efforts by GCJFS to assist the parents to remedy the problems that initially caused the children to be placed outside the home, the parents failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the home.
 {¶ 55} The juvenile court was especially concerned with the parents' failure to adequately utilize counseling, drug and alcohol treatment services, psychiatric services, and case planning that were provided by GCFJS and reasonably available to them throughout the case. Further, both parents failed to follow through with the application process for seeking public assistance that might be available to them through GCJFS.
 {¶ 56} Specifically, the juvenile court found that both parents were chemically dependent on methamphetamines and their dependency was so severe that it made the parents unable to provide an adequate permanent home for the children. The court did not anticipate the parents being able to address their dependency within one year of the permanent custody hearing. The court also found that the parents have demonstrated lack of commitment toward the children by failing to take reasonable steps to obtain proper housing and steady employment during the course of these proceedings and by failing to use reasonable efforts to achieve the goals of the case plan.
 {¶ 57} The juvenile court then considered the best interests of the children. In its analysis, the court considered the factors listed in R.C. 2151.414(D), and found, by clear and convincing evidence, that it was in the children's best interest that GCJFS be granted permanent custody of the children. The court also considered the factors outlined in R.C. 2151.414(E)(7) through (11) and found none applicable. Accordingly, the juvenile court ordered that Jordan and James be placed in the permanent custody of GCJFS and the rights and obligations of the parents be terminated.
 {¶ 58} From this judgment, appellants set forth one assignment of error:
 {¶ 59} "[1.] The trial court erred in granting permanent custody to GCJFS * * * because such decision was contrary to the manifest weight of the evidence and resulted in a manifest miscarriage of justice."[2]
 {¶ 60} In the instant matter, the juvenile court found that the children were not abandoned and had not been in the care of a service agency for twelve or more months of a consecutive twenty-two month period, and that the children could not be placed with either parent within a reasonable time. The juvenile court considered all the relevant evidence and found that one or more of the conditions enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to Betsy and Len. Accordingly, the court was thus required to find that the children could not be placed with the parents within a reasonable amount of time. The court further found that the children should not be placed with either parent and that it was in the best interests of the children to be placed in the permanent custody of GCJFS. Accordingly, the juvenile court complied with the dictates of R.C. 2151.414 when terminating parental rights and granting custody of the children to GCJFS.
 {¶ 61} In appellants' sole assignment of error, they argue that the juvenile court's judgment was against the manifest weight of the evidence. Specifically, they collectively allege that the juvenile court erred by: (1) finding that Betsy continuously and repeatedly failed to substantially remedy the conditions causing the children to be placed outside the home; (2) finding that Betsy demonstrated a lack of commitment to the children by failing to work toward completion of the case plan; (3) finding that Betsy was chemically dependent on methamphetamines and that her dependency was so severe that it made her unable to provide an adequate home for the children and that she could not address the issue within one year of the hearing; (4) finding that GCJFS used reasonable case planning and diligent efforts to assist the parents to remedy the problems; (5) not granting Betsy's request for an extension of time to complete the reunification process; (6) finding that it was not in the children's best interest to be placed with their paternal grandmother; and (7) finding that it was in the children's best interest to have permanent custody granted to GCJFS. We will address each argument separately. Our careful review of the record reveals the juvenile court did not abuse its discretion when making these findings.
 {¶ 62} In the first argument, all appellants contend that the juvenile court erred by finding that Betsy continuously and repeatedly failed to substantially remedy the conditions causing the children to be placed outside the home. Specifically, they argue that Betsy substantially complied with the case plan. We disagree.
 {¶ 63} R.C. 2151.414(E) places responsibility on the parents to remedy the situation that caused the children to be placed outside the home. According to R.C. 2151.414(E)(1), a juvenile court is required to find that the child cannot and should not be placed with either parent if it finds: "* * * the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."[3]
 {¶ 64} The case plan was designed to remedy the domestic violence between the parents, the drug use of the parents, the unsanitary conditions within the home, the parents' lack of stable employment, and the overall unstable home of the children. Despite this, the juvenile court heard evidence and found that "Betsy Ross has showed a lack of commitment to the children by failing to address the concerns in the case plan." Further, the juvenile court found that:
 {¶ 65} "Betsy Ross has consistently tested positive for the use of illegal drugs. She most commonly tested positive for the use of illegal methamphetamines. Betsy Ross initiated a second drug and alcohol assessment as ordered by the Court, but failed to complete the assessment. During the course of the second assessment she continued to deny the use of illegal drugs. On the 10th day of October 2003, Betsy Ross was a passenger in an automobile stopped by an Ashtabula sheriff deputy. At the time of the traffic stop, she was found to be in possession of a small baggie containing methamphetamines.
 {¶ 66} "Throughout the duration of the case, Betsy Ross has continued to maintain a relationship with her husband, Len Ross. Neither Betsy Ross nor Len Ross have adequately addressed relationship issues in individual or joint counseling. Betsy Ross has been unable to maintain stable employment or stable housing * * *. She claims to be living between the home of her mother-in-law in Ashtabula County and a friend who resides in Western Pennsylvania. She claims to be working as a cocktail waitress, a job she has held for the past three weeks, but did not produce any documentation verifying her employment. Betsy Ross expresses her desire to maintain her relationship with her husband when he is released from prison and a desire to work to achieve the goals in the case plan. However, she continues to deny the existence of her substance abuse problem and is not presently in counseling."
 {¶ 67} These findings are supported by the record. The record is clear that Betsy failed to utilize the medical, psychiatric, and other social and rehabilitative services that were made available to her for the purpose of changing her conduct to allow her to resume and maintain her parental duties.
 {¶ 68} The case plan had been amended to require Betsy to receive counseling twice a month. However, Ms. Wiedmann last saw Betsy on August 28, 2003, and Betsy had many no shows thereafter. Further, Betsy never completed a second chemical dependency assessment with Ms. McGruder. Ms. McGruder last saw Betsy on August 27, 2003, and thereafter Betsy had three no shows.
 {¶ 69} Betsy tested positive for marijuana on July 23, 2003. She also tested positive for methamphetamines on November 21, 2002, April 23, 2003, July 21, 2003, and November 10, 2003. Importantly, Betsy's last positive test was three days before the final hearing. Betsy was arrested for possession of methamphetamines on October 10, 2003. Further, Betsy repeatedly denied her use of drugs and made various excuses attempting to explain her positive drug tests and her possession of methamphetamines.
 {¶ 70} Betsy could produce no documentation of any employment and did not have a stable home. Betsy and Len's home was foreclosed upon and they moved into a trailer in the back of a junkyard, against the wishes of the owner. When Len began his prison term, Betsy moved in briefly with her uncle. At the time of the hearing, Betsy was shuffling between the home of Ms. Mitchell and the home of a friend in Pennsylvania.
 {¶ 71} With regard to the domestic violence, Betsy and Len continue to maintain a relationship and a desire to be together when he is released from prison. It is worth nothing that parental rights have been terminated based solely on a father's continual abuse of the mother, when there was no credible evidence that the mother would discontinue the relationship. See, e.g., In re Glenn (2000), 139 Ohio App.3d 105.
 {¶ 72} Betsy failed in a multitude of ways to substantially remedy the conditions that caused her children to be removed from the home. She failed to receive counseling with Ms. Wiedmann twice a month; she failed to complete a second assessment with Ms. McGruder; she repeatedly tested positive for drugs over a one-year period of time and was arrested for possession of methamphetamines; she failed to maintain a stable home; and she could not provide documentation of her alleged employment.
 {¶ 73} This combination of repeated failures spans the entire course of the case, from May 28, 2002, when GCJFS filed the original complaint, to the time of the final hearing on November 13, 2003. These repeated failures strongly support the juvenile court's conclusion that Betsy continuously and repeatedly failed to substantially remedy the conditions that caused her children to be removed from the home, and she failed to utilize the services that were offered to her. While non-compliance is not enough to terminate her parental rights, her repeated failures to remedy the situation are enough. See, e.g., In re Bailey (July 20, 2001), 11th Dist. No. 2001-G-2340, 2001 Ohio App. LEXIS 3293. Accordingly, the juvenile court did not abuse its discretion, and this first argument is not well-taken.
 {¶ 74} In the next argument, Betsy and the children contend that the court erred by finding that Betsy demonstrated a lack of commitment to the children by failing to work toward completion of the case plan. Specifically, they contend that the finding was erroneous because Betsy substantially complied with the case plan, visited the children, and loved the children. This argument is without merit.
 {¶ 75} As we previously discussed, Betsy did not substantially comply with the case plan. Further, simply loving the children and visiting the children does not preclude a finding that Betsy demonstrated a lack of commitment to the case plan. The record clearly demonstrates that Betsy showed an unwillingness to provide an adequate permanent home for the children. Betsy had not received counseling since August 28, 2003, and she never completed a second chemical dependency assessment with Ms. McGruder. Betsy planned on getting back together with Len although their domestic issues were not resolved. Most importantly, Betsy did not have a stable home; she shuffled between the homes of Ms. Mitchell and a friend in Pennsylvania. Her shelter was at their discretion. Ms. Lee even specifically testified that she felt that Betsy was unwilling to get a job, establish a home, pay rent and utilities, and provide food and clothing for the boys. Accordingly, the juvenile court did not abuse its discretion when finding that Betsy demonstrated a lack of commitment to the children by failing to work toward completion of the case plan.
 {¶ 76} Next, all appellants argue that the juvenile court erred by finding that Betsy was chemically dependent on methamphetamines and that her dependency was so severe that it made her unable to provide an adequate home for the children and that she could not address this within one year of the permanent custody hearing. Betsy specifically argues that no counselor testified that she was chemically dependent, and she contends that her positive drug tests and her possession of methamphetamines do not equal the chemical dependency as enumerated by R.C. 2151.414(E)(2). This argument is without merit.
 {¶ 77} We note that R.C. 2151.414(E) does not require, for a finding of chemical dependency, that an expert testify to a parent's chemical dependency. In re McClintock (Oct. 25, 1991), 11th Dist. No. 90-P-2229, 1991 Ohio App. LEXIS 5144. InMcClintock, this court stated, "[e]ven though [R.C. 2151.414] refers to chemical dependency as compared to excessive use, the various courts have not interpreted the * * * language to require expert testimony." (Emphasis added.) Id. at 8. For instance, we upheld a finding of chemical dependency upon the fact that both parents had failed drug screening tests following convictions for drug trafficking. See In re Holmes (June 28, 1991), 11th Dist. No. 90-A-1357, 1991 Ohio App. LEXIS 3093.
 {¶ 78} In the instant matter, the juvenile court's finding was strongly supported by the evidence. Betsy tested positive for marijuana use on July 23, 2003. She also tested positive for methamphetamines on November 21, 2002, April 23, 2003, July 21, 2003, and November 10, 2003. Despite this, Betsy continued to deny her use of methamphetamines and blamed her positive tests on her use of Sudafed. Further, Betsy was also arrested for possession of methamphetamines on October 10, 2003. At that time, Betsy told the officer that she had borrowed the coat in which the baggie of methamphetamines was found, but Betsy was wearing the same coat on the day of the final hearing. Betsy also failed to complete the second drug and alcohol assessment with Ms. McGruder, as was required by the juvenile court.
 {¶ 79} Betsy's drug use was not limited to a single instance, but her drug use was instead a repeated course of conduct that spanned at least a one-year course of time. If Betsy was not chemically dependent and was interested in getting her children back, she would have complied with the case plan and remained free of drugs. In the alternative, the evidence suggests that Betsy was chemically dependent and not able to stay drug-free. Accordingly, Betsy's actions clearly indicate she was chemically dependent, and her firm and repeated denial of her methamphetamine use clearly indicates a pattern of behavior that can reasonably be anticipated to continue. The trial court did not abuse its discretion, and this argument is not well-taken.
 {¶ 80} All appellants next argue that the juvenile court erred by finding that GCJFS used reasonable case planning and diligent efforts to assist the parents to remedy the problems that caused the children to be placed outside the home. Betsy specifically argues that GCJFS had an obligation to make services available to her and Len, and Betsy contends GCJFS made "no efforts at all" to provide them with information regarding what services might be available. She notes, "[n]o one followed up with her to schedule appointments, no one discussed transportation assistance with her * * *. Even though the workers knew she had transportation problems" the visits were cancelled if they were late. This argument is void of merit.
 {¶ 81} It is not the job of GCJFS to hold the parents' hands throughout the case plan and reunification process. R.C. 2151.414
only requires GCJFS to assist the parents to remedy the problems that initially caused the children to be placed outside the home, and the record demonstrates that GCJFS made numerous efforts to help the Betsy and Len do so. See, e.g., In re Vance, 3d Dist. Nos. 5-03-16, 5-03-17, and 5-03-18, 2003-Ohio-6991; In re JosephP., 6th Dist. No. L-02-1385, 2003-Ohio-2217, at ¶ 43.
 {¶ 82} As stated earlier, the case plan was designed to remedy the domestic violence between the parents, the drug use of the parents, the unsanitary conditions within the home, the parents' lack of stable employment, and the overall unstable home of the children. GCJFS clearly undertook diligent efforts to remedy these circumstances.
 {¶ 83} For example, evidence had indicated that some of the domestic issues between Betsy and Len stemmed from Betsy's reported rape. Betsy was provided counseling from Ms. Wiedmann and was required to attend two sessions per month beginning on June 10, 2003. Ms. McGruder testified that Betsy's attendance, at first, was good, but then Betsy started to miss appointments. Ms. McGruder last saw Betsy on August 28, 2003. Thereafter, Betsy made appointments, but she had many no shows.
 {¶ 84} Both Len and Betsy were each required to undergo substance abuse assessments. Len failed to show up. Although Betsy did complete her first assessment, she failed to complete a second assessment which was later required. Both continued to test positive for marijuana and/or methamphetamines throughout the course of the case. Len was also ordered to undergo a mental health assessment, but he failed to appear for his appointment.
 {¶ 85} The evidence also demonstrates that GCJFS provided diligent efforts to help Betsy and Len obtain stable employment. Mr. Brobst was in charge of determining eligibility for Medicaid, food stamps, and cash assistance programs. Betsy met with Mr. Brobst, but Len did not. Len outwardly refused to participate in the jobs program, which would enable Len and Betsy to become eligible for Medicaid, food stamps, and cash assistance programs. While Betsy was assigned to a job experience, she failed to comply with the program's requirements. As a result, a sanction was placed on the case. Betsy was scheduled for three redeterminations, but she failed to appear for any of the appointments. Betsy filed another application, but it was denied because she again failed to show up for her appointment.
 {¶ 86} Further, Ms. Dwyer met with Betsy and encouraged her to follow the case plan and make the required appointments. It is also apparent that Betsy failed to keep Ms. Wiedmann and Ms. Dwyer apprised of where she was living. Providing a telephone number and/or address to her counselor or her social worker would definitely have helped to facilitate adequate communication that would assist Betsy's ability to comply with the case plan.
 {¶ 87} The record is clear that GCJFS provided resources to remedy the conditions that caused the children to be removed from the home; GCJFS provided counseling, chemical dependency assessment, psychiatric assessments, an employment program, eligibility for Medicaid and food stamps, and other services to Betsy and Len. Betsy and Len failed to take advantage of these services. Despite the reasonable case planning and diligent efforts to assist them in remedying the conditions, Betsy and Len's home was foreclosed upon, Betsy's shelter was at the discretion of other persons, neither Betsy nor Len had a stable job, Betsy and Len both continued to test positive for marijuana and/or methamphetamines for a one-year course of time, and Len was in prison.
 {¶ 88} Betsy's contention that GCJFS made "no efforts at all" to provide her and Len with information regarding what services might be available is void of any merit. First, Betsy did not always provide her counselor or caseworker a telephone number or address where she was located. Moreover, Betsy had to assume some level of responsibility in meeting the requirements of the case plan. Betsy began counseling, began a second chemical dependency assessment, and met with Mr. Brobst about Medicaid and food stamps; however, she always failed to follow through with the requirements. It is clear that Betsy was aware of the resources available to her, but she failed to take advantage of them. See, e.g., In re A.S., 8th Dist. No. 79970, 2002-Ohio-330, 2002 Ohio App. LEXIS 341, at 16-17.
 {¶ 89} Accordingly, the evidence supports the finding that GCJFS used reasonable case planning and diligent efforts in assisting Betsy and Len to remedy the problems that caused the children to be placed outside the home. The juvenile court did not abuse its discretion, and this argument is not well-taken.
 {¶ 90} Betsy next contends that the juvenile court erred by not granting her request for an extension of time to complete the reunification process. We disagree.
 {¶ 91} The matter before us represents the precise circumstances for which the Ohio General Assembly enacted the statutory time limitations of R.C. 2151.414(B). Although Betsy was not an evil or abusive mother, there was clear and convincing evidence presented establishing that her children were victimized by her inability to care for them. The evidence shows a pattern of neglect by Betsy which resulted from her drug use and inability to maintain stable employment. As a result, she created an unstable home environment for her children. Rather than allowing the children to languish in the temporary custody of GCJFS for an extended amount of time, the legislature has determined that a period of twelve months of a consecutive twenty-two month period was an adequate duration of time for Betsy to resolve her parenting issues. She has failed to do so. Accordingly, the trial court did not abuse its discretion by failing to grant Betsy's request for an extension of time to complete the reunification process. This argument is without merit.
 {¶ 92} Betsy next argues that the juvenile court erred by finding that it was not in the children's best interest to be placed in the custody of their grandmother, Ms. Mitchell. We disagree.
 {¶ 93} It becomes clear that the juvenile court did not abuse its discretion. First, we note that Ms. Mitchell had a son who was incarcerated for murder. Regardless, Ms. Mitchell was not recommended for placement because she did not know about the domestic violence between Len and Betsy, and she, therefore, might have allowed the children near their parents. Indeed, Ms. Mitchell testified that she would do whatever was necessary in that regard including obtaining a restraining order against the parents. Despite this, the evidence supported the finding, and the juvenile court did not abuse its discretion.
 {¶ 94} Lastly, Betsy and the children argue that the juvenile court erred by finding that it was in the children's best interest to have permanent custody granted to GCJFS. Betsy and the children specifically argue that Betsy loved her children and that they had a loving relationship. This is unrefuted. However, based on the foregoing analysis, the record is clear that Betsy's continued drug use, inability to maintain stable employment, and plans to get back together with Len made her unable to provide a stable home environment for her children. Accordingly, the trial court did not abuse its discretion by finding that it was in the children's best interest to be placed in the permanent custody of GCJFS.
 {¶ 95} In conclusion, the juvenile court did not abuse its discretion when making its findings, and appellants' assignment of error is without merit. We hereby affirm the judgment of the Geauga County Juvenile Court.
O'Neill, J., Grendell, J., concur.
[1] The case plan, as amended on June 10, 2003, required Betsy to see a counselor twice a month.
[2] The appellants, in their individual appellate briefs, each organize their arguments slightly differently, but the arguments are interrelated and at times overlap. For our purposes and the purposes of consolidation, we will consider the arguments of all parties collectively under one assignment of error. As we analyze each specific argument, however, we will point out which appellant(s) put forth the argument.
[3] The current version of R.C. 2151.414(E)(1) became effective on October 5, 2000. It states, "[f]ollowing the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed repeatedly andcontinuously to remedy the conditions * * *." (Emphasis added.) A previous version of the same section also required the parents to repeatedly and continuously fail, over at least a six month period of time, to remedy the conditions. See, e.g., In reWilliam S. (1996), 75 Ohio St.3d 95, 98. The six month requirement has been removed. Because the complaint in this matter was filed on May 28, 2002, well after the current version of the section became effective, we will apply the current version of R.C. 2151.414. Despite this, it is clear that Betsy's combined failures to remedy the conditions spanned a course of time greater than six months.