[Cite as *In re M.A.L.-C.*, 2022-Ohio-1845.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE M.A.L.-C.

A Minor Child

[Appeal by L.D., Mother]

No. 111041

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 2, 2022

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-21905900

***Appearances:***

Rick L. Ferrara, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee*.

MARY J. BOYLE, J.:

{¶ 1} Appellant, L.D. ("Mother"), appeals from the juvenile court order awarding temporary custody of her daughter, M.A.L.-C., to the Cuyahoga County Division of Children and Family Services ("CCDCFS"). For the reasons set forth below, we affirm.

## I. Facts and Procedural History

{¶ 2} On July 12, 2021, CCDCFS filed a complaint in juvenile court, alleging that M.A.L.-C. (d.o.b. 10/17/2007) was neglected and dependent and requesting predispositional temporary custody. The complaint alleges that Mother and M.A.L.-C. have a parent-teen conflict, which Mother has failed to resolve, despite services offered; M.A.L.-C. has significant mental health and behavioral issues; Mother has mental health issues that interfere with her ability to provide adequate care; Father has prior felony convictions of attempted abduction, assault, and unlawful restraint; and Father has failed to visit or communicate with M.A.L.-C. since birth.

{¶ 3} After a hearing held that same day, the trial court ordered the child placed in the predispositional temporary custody of CCDCFS. An adjudicatory hearing was then held on September 27, 2021. At the conclusion of the adjudicatory hearing, the magistrate took the matter under advisement so that he could review the evidence and his notes and reach an appropriate decision. The magistrate also had an in camera interview with M.A.L.-C. on October 5, 2021.

{¶ 4} The magistrate then issued his decision on October 7, 2021, finding the child to be neglected and dependent. The magistrate stated that the "evidence was clear that there is great conflict between Mother and child in this case. Mother, in her own testimony, considers the child to be a liar and a bully and testified that there is conflict today, yesterday, and tomorrow with the child. It is clear that due

to the conflict in the home, that child has run away at least three (3) times in the relevant period."[1]

{¶ 5} A dispositional hearing was held on the same day. Over Mother's objection, the magistrate incorporated the testimony from the adjudicatory hearing into the dispositional hearing. The following relevant evidence was adduced at both hearings.

{¶ 6} At the adjudicatory hearing, CCDCFS short-term service worker Ashlee Adams ("case worker") testified that she first became involved after the agency received a referral on May 26, 2021, that M.A.L.-C. kept running away due to concerns of physical and emotional abuse by Mother. CCDCFS received two additional referrals within the next two months because M.A.L.-C. attempted to cut herself with a razor and attempted to run away again. With regard to the May 2021 incident, Mother admitted to having physically disciplined M.A.L.-C., after which CCDCFS recommended family preservation services and returned M.A.L.-C. to Mother's care. When Mother appeared at CCDCFS to pick up M.A.L.-C., she refused Family Preservation services. Mother claimed that M.A.L.-C. was seeing a new therapist through Murtis Taylor but was unable to indicate when M.A.L.-C. had last spoken with the therapist. During a subsequent conversation held on July 8, 2021, Mother told the case worker that she always has conflict with M.A.L.-C. "today, yesterday, and tomorrow." (Tr. 20, Sept. 27, 2021.)

---

[1] On October 19, 2021, Mother filed objections to the magistrate's October 7, 2021 decision. CCDCFS opposed, and the court overruled the objections and adopted the magistrate's decision on November 1, 2021.

{¶ 7} The case worker testified that M.A.L.-C. described Mother "as always downing her, that she can't do anything right, and that she couldn't take it anymore. [M.A.L.-C.] disclosed that she ran away because she couldn't take it anymore. She didn't feel safe with her mom and she did not want to return home." (Tr. 21, Sept. 27, 2021.) M.A.L.-C. ran away after the case worker's home visit on July 8, 2021. M.A.L.-C. appeared at CCDCFS the following day accompanied by her maternal aunt because of the same concerns with Mother. CCDCFS did not feel that M.A.L.-C. was safe in Mother's care because M.A.L.-C. had been running away from home frequently and began engaging in self-injurious behaviors. At the time of the September 27, 2021 hearing, M.A.L.-C. was placed with her maternal grandmother.

{¶ 8} Maternal aunt Teresa Lawson ("Aunt") also testified at the adjudicatory hearing and indicated that M.A.L.-C. would contact her after she ran away from home on the three occasions described above. Aunt testified that M.A.L.-C. "was scared I was going to take her back home to her mama." (Tr. 56, Sept. 27, 2021.) Aunt took M.A.L.-C. back to her home on each of the three occasions. Aunt testified that she has observed Mother get upset with M.A.L.-C. Aunt recalled a time in March or April 2021, when Mother was at her house and told Aunt's grandchildren "to excuse her mental daughter [M.A.L.-C.] * * * and [Mother] reached over and tried to choke [M.A.L.-C.] and [M.A.L.-C.] ran." (Tr. 60, Sept. 27, 2021.) Aunt then got into her car to search for M.A.L.-C. When she found her, M.A.L.-C. asked her to call the police. After M.A.L.-C. had run away, Aunt described her conversation with Mother, noting that she was "[v]ery nasty, rude, yelling,

screaming, howling, accusing me * * * [and] [t]hat she was going to give [M.A.L.-C.] away to strange people. She was going to give her away, basically. She tried to give her away to her friends next door." (Tr. 62-63, Sept. 27, 2021.) The last interaction she had with Mother was at Mother's house in July 2021, when M.A.L.-C. texted her to come over. Aunt testified that Mother broke through the bathroom door to get to M.A.L.-C. Police were already on the scene when she arrived.

{¶ 9} Mother testified that she has two daughters, M.A.L.-C., who was 13 years old at the time of the adjudicatory hearing, and S.A.F., who was six years old at the time of the hearing. She testified that she loves M.A.L.-C. and has been working with her to get help for her mental health. M.A.L.-C. had a few different therapists and was prescribed medicine for ADHD and a bipolar and trauma diagnosis. She testified that M.A.L.-C. would not always want to take her medications and would sometimes act out. Mother further testified that M.A.L.-C. is on an IEP.

{¶ 10} When asked about the abuse allegations, Mother stated, "yes, I have spanked her, as well, but I never abused my baby. My baby don't get a whooping all the time. She don't get fussed at all the time. And I remove her phone away from her at times, but she has emotional issues and everything." (Tr. 99, Sept. 27, 2021.) Mother described M.A.L.-C. as spoiled because of all the attention she gave her before her younger sister was born. Mother denied breaking down the bathroom door. Mother further testified that she was upset with her relatives and described them as "my abusers," indicating that Aunt should have spoken with her when

M.A.L.-C. ran away because she is her sister. Mother stated that her relatives are using M.A.L.-C. "to try to knock me down because they see me trying to do positive work in the community and stuff * * * and they're just trying to pull me down." (Tr. 102, Sept. 27, 2021.)

{¶ 11} Mother denied ever saying that she wanted to get rid of M.A.L.-C. She stated, "[i]f that's the case, I would have did it when she was young or born, you know, dealing with [her], you know. But, no, I kept my baby. That's my first baby. That's my first love. * * * She's 14 years old and we've been struggling — and I have been struggling with her disability for the longest, and so when — she turned 14 and when she gets more civilized, you know, she still struggling, but what was really going down — where were you? Where were they?" (Tr. 110, Sept. 27, 2021.) Mother denied any mental health issues of her own. Mother acknowledged that M.A.L.-C. had run away three or four times in 2021.

{¶ 12} Prior to the commencement of the dispositional hearing on October 7, 2021, counsel for Mother advised the court that Mother agreed with temporary custody and the case plan but did not agree with M.A.L.-C.'s placement with maternal grandmother or anyone in her family. She preferred that M.A.L.-C. be removed from that home and placed in foster care. The magistrate addressed Mother directly and determined that the matter would proceed with a hearing rather than by agreement.

{¶ 13} CCDCFS Child Protection Specialist Brionna Blair ("child protection specialist") testified that a case plan had been developed, which included services to

address Mother's issues with mental health and parenting. Mother had been referred to the juvenile court psychiatric department for an evaluation and to ACE Wellness for individual counseling. At the time of the dispositional hearing in October 2021, Mother was on the list for an evaluation, she began her individual counseling with ACE Wellness, and she participated in art therapy through Signature Health. The child protection specialist testified that Mother also completed a parenting program through North Star.

{¶ 14} The child protection specialist further testified that M.A.L.-C. had a case plan to address her mental health. She was engaged in individual counseling and family counseling with Mother, as well as group therapy, all through ACE Wellness. M.A.L.-C.'s therapist reported that M.A.L.-C. has "had a lot of traumas and she has a hard time * * * getting her to open up and talk freely about her traumas." (Tr. 20-21, Oct. 7, 2021.) At the time of the hearing, M.A.L.-C. was living with her maternal grandmother, and the child protection specialist testified that M.A.L.-C.'s basic needs were being met and she was doing well. M.A.L.-C. had also been doing well in school with no current behavioral issues reported. Maternal grandmother has been very cooperative with CCDCFS and willing to meet M.A.L.-C.'s basic needs. CCDCFS felt it was appropriate for M.A.L.-C. to remain placed with her maternal grandmother at the time of the dispositional hearing with the hope of reunification once M.A.L.-C. had some stability with her mental health and was able to build a better bond and relationship with Mother. The child protection specialist

testified that she was aware that Mother "didn't like the placement because she didn't get along with her relatives." (Tr. 38, Oct. 7, 2021.)

{¶ 15} Mother testified at the dispositional hearing that she has sufficient space and provisions in her home for M.A.L.-C. Mother testified that she was concerned about M.A.L.-C.'s sleeping arrangements at maternal grandmother's and was also concerned that M.A.L.-C. was required to remain in her room under COVID quarantine for ten days. Mother testified that she loves her mother (maternal grandmother) but does not see herself as "getting love back," that her family excludes her and "was trying to kidnap [her] kids, as well." (Tr. 57, Oct. 7, 2021.) Mother stated that her family was "just using my baby to hurt me, and then at the same time, they're confusing my baby, you know, and she want to come home, but they — it's like she don't. It's like they're confusing her. She's really confused. I don't know." (Tr. 62, Oct. 7, 2021.) Mother testified that she is ready to have M.A.L.-C. return home and would like to move so M.A.L.-C. can have her own room.

{¶ 16} After all parties had rested, M.A.L.-C.'s Guardian ad Litem ("GAL"), gave her oral recommendation that M.A.L.-C. should be committed to the temporary custody of CCDCFS, stating that M.A.L.-C. expressed "that she does not want to return to mother. She would like to stay with maternal grandmother. She likes it there. As the worker testified, the placement is appropriate." (Tr. 73-74, Oct. 7, 2021.) The GAL further stated that Mother and M.A.L.-C. "both need to engage in counseling, individually and family counseling, to address any issues that are ongoing before reunification." (Tr. 74, Oct. 7, 2021.)

{¶ 17} After the conclusion of the hearing, the magistrate issued a decision on October 8, 2021, recommending that M.A.L.-C. be placed in the temporary custody of CCDCFS. The magistrate found that at this time, living with Mother is not in M.A.L.-C.'s best interest. The magistrate further found that M.A.L.-C. is placed with a relative.

{¶ 18} Mother did not file any objections to this dispositional recommendation, and the juvenile court issued a journal entry on November 2, 2021, adopting the magistrate's decision and ordering that M.A.L.-C. be placed in the temporary custody of CCDCFS. The court found that "the child's continued residence in or the return to the home of [Mother], at this time, will be contrary to the child's best interest."

{¶ 19} It is from this order that Mother appeals, raising the following three assignments of error for review.

> **Assignment of Error One:** The trial court abused its discretion in awarding temporary custody where the state of Ohio admitted to failing to comply with mandatory kinship search obligations.
>
> **Assignment of Error Two:** The trial court abused its discretion in allowing hearsay testimony.
>
> **Assignment of Error Three:** The trial court abused its discretion in awarding temporary custody because the state did not present sufficient, clear and convincing evidence necessary for the order.

## II. Law and Analysis

### A. Kinship Search Obligations

{¶ 20} In the first assignment of error, Mother argues the juvenile court abused its discretion in granting temporary custody to CCDCFS after it admitted that it did not perform a kinship search as required by R.C. 2151.4116.

{¶ 21} R.C. 2151.4116, which was enacted seven days before the dispositional hearing on October 7, 2021, promotes the placement of children with family members when possible. The statute provides, in relevant part, "[a] public children services agency or private child placing agency shall make intensive efforts to identify and engage an appropriate and willing kinship caregiver for the care of a child who is in * * * [t]emporary custody of the agency[.]" R.C. 2151.4115(A)(1) states that "'[k]inship caregiver' has the same meaning as used in section 5101.85 of the Revised Code." Under R.C. 5101.85(A)(1), "kinship caregiver" includes the "following individuals related by blood or adoption to the child: * * * [g]randparents[.]"

{¶ 22} While the evidence at the dispositional hearing establishes that the child protection specialist did not conduct a kinship search, the evidence also demonstrates that CCDCFS's placement department staff satisfied this requirement. When asked by Mother's counsel whether an intensive search for kinship placement was conducted, the child protection specialist explained that M.A.L.-C. "was already placed with a relative that was approved by the Kinship Department[.]" (Tr. 36, Oct.7, 2021). As a result, the fact that the child protection specialist did not herself

conduct such a search does not support Mother's claim that CCDCFS failed in its duty to do so.

{¶ 23} Therefore, the first assignment of error is overruled.

### B. Hearsay Testimony

{¶ 24} In the second assignment of error, Mother argues the juvenile court committed reversible error by permitting hearsay evidence at the adjudicatory hearing.

{¶ 25} We note that the admissibility of evidence differs between adjudicatory and dispositional hearings in juvenile court. As the Supreme Court of Ohio explained:

> The law commands that the proceedings be bifurcated into separate adjudicatory and dispositional hearings because the issues raised and the procedures used at each hearing differ. The issue at the adjudicatory stage of a dependency case is whether petitioner has proven, by clear and convincing evidence, that the child is in fact dependent. The issue at the dispositional stage involves a determination of what is in the child's best interests. There must be strict adherence to the Rules of Evidence at the adjudicatory stage. Yet, "any evidence that is material and relevant, including hearsay, opinion and documentary evidence," is admissible at the dispositional stage. Juv. R. 34(B)(2).

*In re Baby Girl Baxter*, 17 Ohio St.3d 229, 233, 479 N.E.2d 257 (1985). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C).

{¶ 26} In the instant case, Mother contends that the court overruled every one of her objections that attempted to limit hearsay evidence regarding the

allegations in the complaint. She claims that, in doing so, the court allowed Aunt to testify about each instance of referral, with or without direct knowledge of the instances. Mother does not cite specific testimony, but rather cites six different pages of the September 27, 2021 transcript to support her claim. While Mother suggests that the court "simply overruled every objection," a review of the record reveals many instances throughout the hearing when the magistrate sustained a defense objection on the basis of hearsay or otherwise.

{¶ 27} Regarding the transcript pages cited by Mother, the first instance involves Aunt's testimony that she knew M.A.L.-C. ran away because M.A.L.-C. told her that she did. This fact, however, was corroborated by Mother herself during her own testimony. The second instance involves testimony from Aunt that M.A.L.-C. told her to call the police when M.A.L.-C. ran away after Mother choked her. The magistrate overruled this objection, stating that this testimony was not hearsay, but rather Aunt's testimony as to what she observed. The final instance involves Aunt's testimony regarding the actions of first responders in taking M.A.L.-C. to the hospital for examination after Mother kicked open the bathroom door. After objection from counsel, the magistrate limited Aunt's testimony, instructing her that "[t]he only thing you're supposed to testify to is what mother stated or the child." (Tr. 71, Sept. 27, 2021.) This court has previously noted,

> even if inadmissible evidence was admitted by the trial court, it must be shown that the court actually relied on that evidence in its judgment. *In re Fountain* (Feb. 24, 000), 2000 Ohio App. LEXIS 672 at *18, Cuyahoga App. No. 76650 citing *In re Sims* (1983), 13 Ohio App. 3d 37, 41, 468 N.E.2d 111. A trial judge is presumed to be capable of

disregarding improper testimony. *In re Fountain*, supra, 2000 Ohio App. LEXIS 672. The erroneous admission of hearsay evidence is harmless if other evidence, apart from the erroneously admitted evidence, has been offered to prove that which the challenged evidence was offered to prove. *In re: Decker* (1984), 20 Ohio App. 3d 203, 20 Ohio B. 248, 485 N.E.2d 751; *In re: Reeves* (June 7, 2000), 2000 Ohio App. LEXIS 2367, Summit App. Nos. 19650, 19669, 19672, 19673, 19674, 19705, 19706, 19707.

*In re M.H.*, 8th Dist. Cuyahoga No. 80620, 2002-Ohio-2968, ¶ 73.

{¶ 28} Here, even if the court improperly admitted hearsay evidence, Mother cannot demonstrate that the court actually relied on this evidence in its judgment. The magistrate was very clear at the conclusion of the adjudicatory hearing that he needed "to review my notes, look at the complaint, hear what I've heard that may or may not be hearsay. I don't want to — What I've heard substantial-wise, what is the substance of the evidence here and everything." (Tr. 139-140, Sept. 27, 2021.) In fact, his findings demonstrate that he did not rely on any improper testimony when issuing his ruling. The court's adjudicatory journal entry of November 2, 2021, states in relevant part, "Based on the totality of relevant and admissible testimony, the Court does find that the child is neglected and dependent."

{¶ 29} Therefore, the second assignment of error is overruled.

## C. Temporary Custody Award

{¶ 30} In the third assignment of error, Mother argues that the court abused its discretion in awarding temporary custody to CCDCFS because the court did not rely on sufficient, probative evidence.

{¶ 31} When reviewing a juvenile court's judgment in child custody cases, the Ohio Supreme Court has stated that the "court's decision in a custody proceeding is subject to reversal only upon a showing of abuse of discretion." *In re A.J.*, 148 Ohio St.3d 218, 2016-Ohio-8196, 69 N.E.3d 733, ¶ 27, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 417, 674 N.E.2d 1159 (1997).

{¶ 32} A juvenile court's determination that a child is neglected or dependent must be based on clear and convincing evidence. R.C. 2151.35(A)(1); Juv.R. 29(E)(4). *In re E.E.*, 8th Dist. Cuyahoga No. 110021, 2021-Ohio-2770, ¶ 30, citing *In re Vinci*, 8th Dist. Cuyahoga No. 73043, 1998 Ohio App. LEXIS 4100, *7 (Sept. 3, 1998), and *In re Hauserman*, 8th Dist. Cuyahoga Nos. 77235 and 77252, 2002 Ohio App. LEXIS 1113, *9 (Mar. 11, 2002). "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re C.B.*, 8th Dist. Cuyahoga No. 92775, 2011-Ohio-5491, ¶ 28, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). "Where clear and convincing proof is required at trial, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof." *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 24, citing *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

{¶ 33} R.C. 2151.03(A)(2) and (4) define a "neglected child" as any child "[w]ho lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian [and] [w]hose parents * * * neglects the child or

refuses to provide the special care made necessary by the child's mental condition[.]" "'Adequate parental care' as used in the statute means "the provision by a child's parent or parents, guardian, or custodian of adequate food, clothing, and shelter to ensure the child's health and physical safety and the provision by a child's parent or parents of specialized services warranted by the child's physical or mental needs." R.C. 2151.011(B)(1). R.C. 2151.03(A)(2) "requires some showing that parents, a guardian, or a custodian is at fault before a finding of a lack of proper (or adequate) care can be made." *In re Riddle*, 79 Ohio St.3d 259, 262, 680 N.E.2d 1227 (1997). To determine whether a child is neglected, the date on which neglect "'existed must be alleged in the complaint and the trial court must determine that the circumstance(s) which support a finding of [neglect] existed as of the date or dates alleged in the complaint.'" *In re E.E.* at ¶ 41, quoting *In re C.O.*, 8th Dist. Cuyahoga Nos. 99334 and 99335, 2013-Ohio-5239, ¶ 31.

{¶ 34} Relevant to the instant case, R.C. 2151.04(B) defines a "dependent child" as any child "[w]ho lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian[.]" Whereas a finding of neglect under R.C. 2151.03(A)(2) requires some showing that the parent is at fault before the child can be found to lack adequate parental care, a finding of dependency under R.C. 2151.04(A) requires no showing of fault, but rather "focuses exclusively on the child's situation to determine whether the child is without proper (or adequate) care or support." *In re Riddle* at 262.

{¶ 35} The parent's conduct is relevant to a finding of dependency to the extent that it can be shown that the parent's conduct adversely impacts the child's environment enough to warrant state intervention. *In re Burrell*, 58 Ohio St.2d 37, 39, 388 N.E.2d 738 (1979). As with a finding of neglect, the juvenile court must also ""'determine that the circumstance(s) which support a finding of dependency * * * existed as of the date or dates alleged in the complaint.'"" *In re E.E.*, 2021-Ohio-2770, at ¶ 41, quoting *In re C.O.* at ¶ 31.

{¶ 36} Mother argues that CCDCFS did not produce clear and convincing evidence supporting temporary custody; the juvenile court's order does not refer to any particular category of "neglected or dependent child"; and the court failed to affirm the allegations in the complaint. Mother relies heavily on her own testimony in her attempt to discredit the testimony of the other witnesses, thereby seeking to substitute her interpretation of the evidence for that of the court.

{¶ 37} A review of the record in the instant case reveals that the juvenile court considered the evidence as presented at the adjudicatory hearing and subsequently found the child to be neglected and dependent. In support of its findings, the court stated in its November 2, 2021 journal entry:

> This Court finds that prior to making its Decision, the Court reviewed the testimony of the Case Worker, Ashlee Adams, the child's Maternal Aunt and the Mother, and all relevant statutes. This Court does admit that the testimony of all three witnesses was at times, confusing and irrelevant. But, the evidence was clear that there is great conflict between Mother and child in this case. Mother, i[n] her own testimony, considers the child to be a liar and a bully and testified that there is conflict today, yesterday and tomorrow with the child. It is clear that due to the conflict in the home, that child has run away at least three

(3) times in the relevant time period. The police have been called on a number of occasions to intervene. Maternal Aunt testified that she witnessed conflict between the child and Mother on a number of occasions and that in March/April of 2021 during an incident at Maternal Aunt's home, that she heard Mother state "excuse my mental daughter" and Mother tried to choke the child and the child ran off. The police were required to intervene after the incident.

* * *

The Court finds that based upon the testimony heard, that a danger to the child exists.

{¶ 38} The court's findings are sufficient to justify the adjudication of neglect pursuant to R.C. 2151.03(A)(2) and of dependency pursuant to R.C. 2151.04(C). CCDCFS workers and Aunt testified about M.A.L.-C.'s issues and needs, the conflict between Mother and M.A.L.-C., and Mother's failure to engage in family preservation services in an attempt to avoid removal and court action. Mother's own testimony confirmed the ongoing conflict, the fact that she and M.A.L.-C. have been struggling, her repeated indications that the child suffered longstanding issues, the fact that the child had run away three to four times in 2021, and the repeated intervention of law enforcement.

{¶ 39} Moreover, there is sufficient competent, credible evidence in the record to support the juvenile court's award of temporary custody to CCDCFS. Once a child has been adjudicated, the court may order the child placed in the temporary custody of CCDCFS if it finds such a disposition to be in the child's best interest by a preponderance of the evidence. R.C. 2151.353(A)(2); *In re A.S.*, 8th Dist. Cuyahoga No. 105651, 2018-Ohio-1085, ¶ 18. Here, the evidence demonstrates that CCDCFS became involved after M.A.L.-C. continued to run away from Mother. Mother and

M.A.L.-C. were in therapy, but additional services were needed for M.A.L.-C. to fully invest in her counseling treatment so that reunification could be achieved and maintained. M.A.L.-C. needed more stability with her mental health and to build a better relationship with Mother. The evidence also demonstrates that the GAL recommended that M.A.L.-C. be placed in the temporary custody of CCDCFS, indicating that M.A.L.-C. expressed "that she does not want to return to mother. She would like to stay with maternal grandmother. She likes it there. As the worker testified, the placement is appropriate." (Tr. 73-74, Oct. 7, 2021.) The GAL further stated that Mother and M.A.L.-C. "both need to engage in counseling, individually and family counseling, to address any issues that are ongoing before reunification." (Tr. 74, Oct. 7, 2021.) Based on the foregoing, we find that the trial court did not abuse its discretion when it determined that it is in M.A.L.-C.'s best interest to be placed in the temporary custody of CCDCFS.

{¶ 40} Mother also claims that the court failed to affirm the allegations in the complaint. It is not necessary, however, for the agency to prove each and every allegation in a complaint for an adjudication, nor is it required that each and every fact that may support an adjudication be explicitly included in a complaint. R.C. 2151.27(A)(1) provides that the "sworn complaint may be upon information and belief, and * * * shall allege the particular facts upon which the allegation that the child * * * is an abused, neglected, or dependent child is based."

**{¶ 41}** In the instant case, the magistrate expressly noted his ability to make appropriate amendments to the complaint based on the evidence presented at the adjudicatory hearing. He stated:

> I've heard an awful lot of things outside this complaint, you know, and sometimes I believe that this Court can make some decisions, amendments and everything, that maybe weren't there.
>
> But I want to make a decision on the complaint, not on things that occurred six months ago, four months ago.
>
> And I get the complaint, the way it's written, is about an ongoing or there was an ongoing conflict and is — is those issues.
>
> Things more recently, and beyond that, I really — I promise you, I'm not going to make my decision based upon that.

(Tr. 141, Sept. 27, 2021.)

**{¶ 42}** The magistrate, before issuing his decision, indicated that he was basing his decision on the allegations of the complaint. Such a position was legally appropriate, and the court's findings are supported by the evidence in the record. Therefore, we find Mother's argument unpersuasive.

**{¶ 43}** In addition to the above arguments, Mother also argues CCDCFS's witnesses could not sufficiently testify as to the credibility of M.A.L.-C.'s hearsay claims, the efficacy of CCDCFS's plan, Mother's progress or M.A.L.-C.'s progress, and M.A.L.-C.'s attitude because the witnesses were not certified in their field and were not licensed social workers.

**{¶ 44}** A witness, however, does not need to be qualified as an expert witness in order to give opinion testimony. Evid.R. 701 sets forth the parameters for lay witness opinion testimony and provides:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

{¶ 45} Therefore, a lay witness may give opinion testimony as long as the testimony is rationally based on the witness's perception and is helpful to the trier of fact in understanding the witness's testimony or determining a fact at issue. In the instant case, the case worker and the child protection specialist testified as lay witnesses based on their direct involvement with and observations of the parties to the case. The record clearly demonstrates that these witnesses did not testify as experts. Rather, each testified as lay witness whose opinion was based on their perceptions and whose opinion was helpful to a determination of a fact in issue — whether temporary custody was in M.A.L.-C.'s best interest. *In re J.T.*, 8th Dist. Cuyahoga Nos. 93240 and 93241, 2009-Ohio-6224, ¶ 81. Mother's argument is unpersuasive.

{¶ 46} Mother next argues that because there was no case plan, there was no aspect that Mother failed to comply with. Her argument, however, does not recognize that a case plan is not to be formally adopted by the trial court until the court issues an appropriate order of disposition. *See* R.C. 2151.353(E) (which states that "[a]s part of its dispositional order, the court shall journalize a case plan for the child"). Additionally, R.C. 2151.412(E) provides:

If all parties agree to the content of the case plan and the court approves it, the court shall journalize it as part of its dispositional order. If the agency cannot obtain an agreement upon the contents of the case plan

or the court does not approve it, the parties shall present evidence on the contents of the case plan at the dispositional hearing. The court, based upon the evidence presented at the dispositional hearing and the best interest of the child, shall determine the contents of the case plan and journalize it as part of the dispositional order for the child.

{¶ 47} The record reveals that this process was completed in the instant case, and the magistrate reviewed the contents before approving the case plan at the conclusion of the dispositional hearing. (Tr. 79-80, Oct. 7, 2021.)

{¶ 48} Lastly, Mother argues that CCDCFS failed to perform an intensive kinship search that would establish what was in M.A.L.-C.'s best interest. In light of our disposition of the first assignment of error, we find this argument unpersuasive.

{¶ 49} Therefore, based on the foregoing, the third assignment of error is overruled.

## III. Conclusion

{¶ 50} For the reasons stated above, we find that CCDCFS did not fail to comply with its kinship search obligations, and the juvenile court did not abuse its discretion in allowing hearsay testimony and in awarding temporary custody to CCDCFS.

{¶ 51} Accordingly, the judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

FRANK DANIEL CELEBREZZE, III, P.J., and
EILEEN T. GALLAGHER, J., CONCUR