[Cite as *In re K.H.-T.*, 2022-Ohio-1504.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE K.H.-T. | : | |
| | : | No. 111001 |
| A Minor Child | : | |
| | : | |
| [Appeal by Mother, S.T.] | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 5, 2022

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-18-907898

### *Appearances:*

Valore & Gordillo LLP and Dean M. Valore, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee*.

LISA B. FORBES, J.:

{¶ 1} S.T. ("Mother") appeals the juvenile court's decision terminating her parental rights and awarding permanent custody of her child, K.H.-T. to the Cuyahoga County Division of Children and Family Services ("CCDCFS"). After reviewing the facts of the case and pertinent law, we affirm.

## I.   Facts and Procedural History

{¶ 2}   K.H.-T. was born on March 16, 2018.  On June 22, 2018, CCDCFS filed a complaint alleging that K.H.-T. was abused and dependent after he was diagnosed with organic failure to thrive and observed at the hospital with unexplained bruises.  In that complaint, CCDCFS also raised concerns regarding Mother's mental health.  On the same day, CCDCFS was granted emergency temporary custody.

{¶ 3}   K.H.-T. was adjudicated abused and dependent on December 4, 2018. On January 6, 2019, CCDCFS was granted temporary custody of K.H.-T.

{¶ 4}   CCDCFS filed a motion requesting permanent custody of K.H.-T. on June 14, 2019.

{¶ 5}   On October 14, 2020, K.H.-T.'s father, D.H. ("Father"), filed a motion seeking legal custody of K.H.-T.  Mother also filed a motion seeking legal custody or in the alternative, legal custody be granted to Melvin Johnson.

{¶ 6}   The court held a disposition hearing on the pending motions on October 28, 2021 ("the hearing").  At the hearing, Father withdrew his motion for legal custody and "agree[d] with the Agency's request for permanent custody."

{¶ 7}   Mother did not attend the hearing, however the juvenile court found "that the notice requirements [had] been met" and that "Mother [made] her appearance through counsel * * *."  In addition, Mother's guardian ad litem ("GAL") was present.  Mother's counsel moved to continue the hearing.  Father and K.H.-T.'s GAL opposed the motion, with K.H.-T.'s GAL arguing that continuance was not in

the child's best interest. The court found Mother's motion not well taken and proceeded with the hearing.

{¶ 8} The following day, the court journalized an entry terminating Mother's parental rights and granting permanent custody of K.H.-T. to CCDCFS. It is from this order that Mother appeals.

## II. October 28, 2021 Hearing

{¶ 9} At the hearing, CCDCFS called Danielle Bailey ("Bailey") as a witness. The GAL for K.H.-T., Elba Heddesheimer, submitted a written report prior to the hearing and also provided a recommendation on the record. In addition, three exhibits were entered into evidence. The following testimony and information were presented at the hearing.

### A. Danielle Bailey

{¶ 10} Bailey testified that she is an "[e]xtended social worker" for CCDCFS who was assigned to work on K.H.-T.'s case in November 2019. After being assigned the case, Bailey reviewed K.H.-T.'s file and learned that CCDCFS became involved with K.H.-T. through an intake referral in June 2018, after he presented to the hospital with "unexplained bruises on his body," and "was diagnosed with failure to thrive* * *." As reflected in the complaint filed by CCDCFS requesting emergency custody and temporary custody of the child, CCDCFS was also concerned with Mother's mental health.

{¶ 11} K.H.-T. was adjudicated abused and dependent and committed to the temporary custody of CCDCFS. The agency developed a case plan with a

permanency goal of reunification. In that case plan, Mother was referred to parenting services because CCDCFS was concerned with "the unexplained bruises on the child, as well as the concerns for his failure to thrive." According to Bailey, Mother was referred to The Centers for Children and Families for parenting classes which she completed "in the fall of 2019." However, when asked if she believed Mother demonstrated a benefit from the parenting classes, Bailey responded, "[i]t's hard to tell * * * with her inconsistency with her visits."

{¶ 12} Mother was also referred for mental-health services through her case plan because she had diagnoses for "schizoaffective disorder, bipolar, and depression" when CCDCFS became involved with K.H.-T. According to Bailey, Mother's "mental health was untreated and * * * [K.H.-T.] wasn't really attending his doctor[']s appointments * * *." CCDCFS was concerned that when Mother was not treating her mental health and taking her medications, that she would not "be able to properly * * * attend to the needs of [K.H.-T.]."

{¶ 13} Throughout the pendency of her case plan, Mother had received mental-health services from Murtis Taylor, NEON, Moore Counseling, and OhioGuidestone. Prior to the hearing, Mother reported to Bailey that she had gone through an intake at OhioGuidestone and "was waiting to be assigned a therapist so that she can start with her medication and medication management services."

{¶ 14} According to Bailey, Mother was not consistent with her mental-health services. Bailey explained that Mother "switched providers multiple times

during the time that [she] had the case, so it's hard to say that she's consistent since she hasn't engaged with one provider."

{¶ 15} Bailey elaborated, that when she was assigned the case, Mother had been receiving counseling and medication management through Murtis Taylor. In approximately "mid 2020" Mother switched to NEON for mental health services, but Mother stopped attending NEON "around November of 2020[.]" Following NEON, Mother scheduled an intake evaluation with Moore Counseling, but never actually received any services there because according to Mother, "they were going under construction * * * so they referred her to OhioGuidestone[.]" Bailey stated that Mother purported to start engaging with OhioGuidestone in June 2021. Mother gave Bailey different reasons for why she switched providers including: "she didn't feel that they were helping her[,]" "that doctors have left at different facilities, so she needed to find new facilities[,]" and "she was looking for something more in her area[.]"

{¶ 16} "At one point, [Mother] was prescribed and taking Latuda." Subsequently, Mother reported to Bailey that she "was still getting her medications" despite the fact that "[s]he had stopped going out to NEON for appointments." Bailey was not able to confirm whether Mother's assertion was true. Bailey did look at one of Mother's prescription bottles, but she "was unable to even verify the date that that particular bottle was given to [Mother] as the date was removed." At the time of the hearing, Bailey did not believe Mother was taking any medication for her

mental health because Mother informed her "that she was waiting to engage with the therapist at OhioGuidestone so that she could get a new prescription[.]"

{¶ 17} Bailey "notice[d] some change[s] in [Mother's] mood and how she relate[d]" to her, which Bailey attributed to "when [Mother was] on and off her medication." Bailey elaborated that when Mother "seems to be more guarded and defensive," she assumed "that she's off [her medication] as opposed to more open and able to converse when she's on her medications." Bailey based her assumption on "experience of watching others with their medications."

{¶ 18} Turning to visitation, Mother was supposed to have weekly, in-person visits with K.H.-T. at The Centers for Children and Families, but Bailey stated that Mother had been inconsistent with attending. "She'll attend for a while and then she'll miss a few * * *. So it's been very back and forth." At the time of the hearing, Bailey reported that Mother had not been attending her visitations and believed the last visitation Mother attended had not been for a month. Bailey did not supervise Mother's visitation, but Mother had a visitation coach.

{¶ 19} During the pendency of the case, Mother's visitation plan had been modified, including going virtual when the COVID-19 pandemic started. When visitation was virtual, Bailey described Mother as "a little more consistent[.]" However, Mother's attendance at in-person visitations went "back and forth." Bailey stated that "there were times where she was attending and she'd be doing good for like a month or so, then she would miss a few. She would state it was due to transportation." Because of the transportation issue, Bailey recalled that The

Centers for Family and Children "tried to put some things in place to help [Mother] with transportation" including sending "an Uber to her home to pick her up[.]". Despite the assistance, Mother "would miss a couple and then she would attend a couple."

{¶ 20} While in CCDCFS custody, K.H.-T. was placed in a foster home and started attending preschool where he had an IEP. K.H.-T. had been placed in his current foster home for "over a year" at the time of the hearing. According to Bailey, K.H.-T. is "doing really well there. He's progressing, definitely getting all of his needs met, talking more. They're working on potty training. He's doing really, really well there."

{¶ 21} Bailey believed that it was in K.H.-T.'s best interest "[t]o be committed to the permanent custody of the Agency" because, in her opinion, Mother was not able to adequately parent K.H.-T. because of "her inconsistency with addressing her mental health and her inconsistency with attending her visits."

**B. K.H.-T.'s GAL**

{¶ 22} The GAL testified that in her opinion, granting CCDCFS permanent custody of K.H.-T. was in his best interest. In making this recommendation, the GAL noted Mother's inconsistency with engaging in mental-health treatment, taking her medication, and "not complying with the case plan."

{¶ 23} The GAL recalled that at the August 19, 2021 semiannual review, Mother claimed to be receiving her medication through NEON. However, the GAL

highlighted for the court that per the testimony from Bailey, Mother was "not a NEON patient or * * * engaged in any therapy with NEON" in 2021.

{¶ 24} According to the GAL, when K.H.-T. was first placed with his current foster mother, "he was panicked about the changes and he * * * really had to have a lot of time to get used to her, her home, and her environment." The GAL had "no concerns regarding his placement. He is thriving and he is really happy there."

{¶ 25} In her report, the GAL stated that K.H.-T. had been placed in his current foster home since April 6, 2020. According to her, K.H.-T. was "thriving at his placement. * * * The child has his own room [and] seemed to be growing well." K.H.-T. gets along with his foster family and the other children in the home. K.H.-T. receives social, emotional, and speech services. He was diagnosed with "a G6PD deficiency which is a food sensitive anemia" meaning, his "red blood cells would deplete and cause immediate harm to him" if he "were to ingest blueberries [or] fava beans * * *." K.H.-T. attends preschool and has an IEP. In school, he has "flourished, he builds on his social emotional skills and independent skills along with addressing speech delays and working with an occupational therapist for fine motor skill development."

{¶ 26} During some visits, Mother was "engaged [and] ask[ed] questions about how the child [was] doing and play[ed] along with * * * her son." However, during many virtual visits, K.H.-T.'s GAL reported that the foster mother observed Mother "laying down with the Television [sic] playing loudly in the background and there [was] limited involvement from her * * *." Mother's scheduled visits, both

virtual and in person have been cancelled and rescheduled frequently at Mother's request.

**{¶ 27}** Finally, in her report the GAL noted that K.H.-T. "has been moved several times in his life * * *. If the child should move again, he should be placed with someone who can provide consistency stability, and permanency and who is dedicated to ensuring his medical needs and educational needs are maintained. "

## III. Law and Analysis

**{¶ 28}** In her sole assignment of error, Mother argues that "the trial court's award of permanent custody and termination of [her] parental rights is against the manifest weight of the evidence."

**{¶ 29}** "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re M.J.*, 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24. "Where clear and convincing proof is required at trial, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof." (Citations omitted.) *In re V.S.*, 8th Dist. Cuyahoga No. 109966, 2021-Ohio-1818, ¶ 27.

**{¶ 30}** "Courts apply a two-pronged test when ruling on permanent custody motions." *In re De.D.*, 8th Dist. Cuyahoga No. 108760, 2020-Ohio-906, ¶ 16. To grant the motion, courts first must find that any of the factors in R.C. 2151.414(B)(1)(a)-(e) apply, or that (B)(2) applies. *Id.* "Second, courts must

determine that terminating parental rights and granting permanent custody to the agency is in the best interest of the child or children using the factors in R.C. 2151.414(D)." *Id.*

### A. R.C. 2151.414(B)(1) Factors

{¶ 31} In its October 29, 2021 journal entry, the juvenile court made a finding under R.C. 2151.414(B)(1)(d), that K.H.-T. "has been in temporary custody of a public children services agency or private child placing agency for twelve or more months of a consecutive twenty-two month period." This finding is supported by evidence in the record.

{¶ 32} "For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." R.C. 2151.414. Here, CCDCFS was granted emergency temporary custody of K.H.-T. on June 22, 2018. Further, K.H.-T. was adjudicated abused and dependent on December 4, 2018. K.H.-T. was continuously in CCDCFS's custody from the original award of temporary custody through the date of the hearing on the agency's motion for permanent custody held on October 28, 2021. Therefore, K.H.-T. was in CCDCFS's temporary custody for twelve or more months of a consecutive 22-month period, satisfying R.C. 2151.414(B)(1)(d).

{¶ 33} Having found that K.H.-T. had been in CCDCFS's custody for "twelve or more months of a consecutive twenty-two month period" under

R.C. 2151.414(B)(1)(d), the juvenile court was not required to make further findings to determine whether or not K.H.-T. cannot or should not be placed with Mother within a reasonable time under subsection (E) of the statute. Nevertheless, the court did make an additional finding that K.H.-T. "cannot be placed with one of the child's parents within a reasonable period of time or should not be placed with either parent" and made findings consistent with several (E) subsections.

{¶ 34} Under subsection (E)(1), the court found that Mother has "failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home."

{¶ 35} Under subsection (E)(2), the court found that Mother has a "chronic mental illness * * * that is so severe that it makes [her] unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year without consistent mental health services and medication management."

{¶ 36} Under subsections (E)(4) and (14), the court found that Mother has been "unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect."

{¶ 37} Under subsection (E)(15), the court found that Mother has "caused or allowed the child to suffer abuse and the Court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety."

{¶ 38} Upon review, we find that all of the court's subsection (E) findings are supported by clear and convincing evidence in the record. Mother has had mental-health services as part of her case plan since its inception. The court heard testimony from Bailey and the GAL that Mother had not consistently engaged mental-health services. Rather, she started and stopped therapy with various providers and had not demonstrated that she consistently took her prescriptions. Evidence presented demonstrated that CCDCFS was concerned that Mother would not be able to adequately care for K.H.-T.'s needs because she was not caring for her own. Further, while the court did hear that Mother had completed the parenting-classes portion of her case plan, it also heard that Bailey was unsure if Mother benefited from those classes as evidenced by her inconsistent visitation.

{¶ 39} Accordingly, the juvenile court's subsection (E) findings are supported by evidence in the record.

## B. R.C. 2151.414(D)(1) and (2) Best-Interest Factors

{¶ 40} In determining whether granting CCDCFS's motion for permanent custody was in K.H.-T.'s best interest, the juvenile court looked at both R.C. 2151.414(D)(1) and (D)(2). While the juvenile court was not required to look at both, the court's findings under each are supported by evidence in the record.

### 1. R.C. 2151.414(D)(1)

{¶ 41} In considering whether the grant of permanent custody was in K.H.-T.'s best interest, the court considered the following R.C. 2151.414(D)(1) factors.

{¶ 42} Under subsection (a) "the interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster parents[.]";

{¶ 43} Under subsection (c) "the custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period[.]";

{¶ 44} Under subsection (d) "the child's need for a legally secure permanent placement[.]";

{¶ 45} Under subsection (e) "whether that type of placement can be achieved without a grant of permanent custody"[.];

{¶ 46} Additionally, the court considered K.H.-T.'s age and the GAL report.

{¶ 47} In considering all of those factors, the court found "by clear and convincing evidence that a grant of permanent custody is in the best interests of the child and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent." This finding is supported by testimony from both Bailey and the GAL that Mother was inconsistent with her visitation with K.H.-T., that K.H.-T. had bonded with his foster family, the length of time K.H.-T. had been in agency custody, and Mother's continued struggles with mental health.

### 2. R.C. 2151.414(D)(2)

{¶ 48} Turning to R.C. 2151.414(D)(2), if all four of its subsections apply, "permanent custody is in the best interest of the child, and the court shall commit

the child to the permanent custody of a public children services agency or private child placing agency." The trial court analyzed the evidence in relation to each of the four subsections and found that permanent custody was in K.H.-T.'s best interest.

{¶ 49} Subsection (a) directed the juvenile court to determine whether one or more of the factors in division (E) of R.C. 2151.414 exist "and that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent." As addressed, the juvenile court found that evidence had been presented supporting five of the division (E) factors ,and our review affirmed the trial court's analysis that K.H.-T. cannot or should not be placed with one of his parents within a reasonable time.

{¶ 50} Subsection (b) directed the juvenile court to determine if K.H.-T. had been in agency custody for two years or longer and, therefore, no longer qualified for temporary custody pursuant to R.C. 2151.415(D). R.C. 2151.415(D)(4) states:

> the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered pursuant to division (D) of this section.

{¶ 51} CCDCFS filed its complaint of abuse and dependency on June 22, 2018, and was granted emergency temporary custody on the same day. Therefore, at the time of the October 28, 2021 hearing, K.H.-T. had been in agency custody for over two years.

{¶ 52} Subsection (c) directed the court to determine if the child met the requirements for a planned permanent living arrangement pursuant to

R.C. 2151.353(A)(5). If the child did not meet the requirements, then this element was satisfied. Here, CCDCFS did not request for K.H.-T. to be placed in a planned permanent living arrangement and there is no evidence that any of the statutory requirements were met.

{¶ 53} Finally, subsection (d) directed the court to determine whether, "prior to the dispositional hearing, no relative or other interested person has filed or been identified in a motion for legal custody of the child." The record does not indicate any such motion was filed.

{¶ 54} Because the evidence presented at the hearing supported all four subsections of (D)(2), the juvenile court was required to find that CCDCFS's motion for permanent custody was in K.H.-T.'s best interest.

{¶ 55} The juvenile court concluded that the allegation in CCDCFS's motion had "been proven by clear and convincing evidence." We agree.

{¶ 56} In reviewing permanent custody proceedings, we are mindful that "the power of the trial court to exercise discretion is peculiarly important. The knowledge obtained through contact with and observation of the parties and through independent investigation cannot be conveyed to a reviewing court by printed record." *Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952). This court has additionally held that the "discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the

impact the court's determination will have on the lives of the parties concerned." *In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist.1994).

{¶ 57} Accordingly, we find the court acted within its discretion, consistent with the clear and convincing evidence in the record, when it terminated Mother's parental rights and granted permanent custody of K.H.-T. to CCDCFS. Mother's sole assignment of error is overruled.

{¶ 58} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

FRANK DANIEL CELEBREZZE, III, P.J., and
EILEEN A. GALLAGHER, J., CONCUR