**[Cite as *In re L.B.*, 2022-Ohio-4748.]**

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE L.B.

A Minor Child

[Appeal by H.B., Mother]

:
:
:
:
:
:

No. 111766

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 29, 2022

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD20909966

*Appearances:*

Law Office of Anthony J. Richardson II, LLC, and Anthony
J. Richardson II, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Shannon D. Parker, Assistant Prosecuting
Attorney, *for appellee*.

FRANK DANIEL CELEBREZZE, III, P.J.:

{¶ 1} Appellant H.B. ("Mother") appeals the decision of the Cuyahoga County Court of Common Pleas, Juvenile Division, granting permanent custody of her daughter, L.B.[1] ("child"), to the Cuyahoga County Division of Children and Family

---

[1] D.O.B. 05/08/2020.

Services ("CCDCFS" or "agency"). After a thorough review of the law and applicable facts, we affirm the judgment of the juvenile court.

## I. Factual and Procedural History

{¶ 2} In November 2020, the alleged father[2] of the child, J.B. ("Father"), notified the agency that he was concerned about the child after receiving concerning messages from Mother.

{¶ 3} After further investigation of Father's claims, the agency filed a complaint for abuse, dependency and temporary custody, along with a motion for predispositional temporary custody. In the complaint, the agency alleged that Mother made continuous threats to kill L.B., suffers from various mental health diagnoses, and that she is unable to provide for L.B. The court held an emergency hearing and a CCDCFS supervisor testified.

{¶ 4} The supervisor testified that since L.B.'s birth, Mother and L.B. had been residing at Zelie's House, a shelter for single mothers and children in Garfield Heights, Ohio. Father notified the agency that he was concerned about the child after receiving messages from Mother stating that she was going to harm L.B. accompanied by photographs of knives. The agency investigated and found additional concerns relating to Mother's mental health and her relationship with L.B., noting that "Mom will let the baby cry and does not comfort the child." (Tr.

---

[2] At the time Father alerted the agency about his concerns, he had not established paternity. Paternity was later established pursuant to the agency's plan for reunification, but Father never expressed any interest in following a case plan or cooperating with the agency. Father is also not a party to this appeal. As such, we focus our review entirely on Mother.

11.) The supervisor also testified that despite Father's concerns, he refused to offer any care for the child until paternity was established. The trial court granted predispositional temporary custody to the agency.

{¶ 5} The agency filed a case plan with an ultimate goal of reunification. The case plan contained services for mental health treatment, parenting, and allowed for supervised visitation with L.B. The case plan also requested that Father establish paternity and that L.B. participate in a "Help Me Grow" program.

{¶ 6} In February 2021, a hearing for adjudication and disposition on the complaint was held. The agency moved the court to amend the complaint, removing the allegations of abuse.

{¶ 7} CCDCFS Social Worker Yasmin Justus, who took in the initial referral and began the investigation, testified at the hearing. Justus reviewed exhibits showing the above-referenced messages and verified that she saw and reviewed them during her investigation. Justus further reviewed messages offered into evidence and noted that she had asked Mother if she sent them. Mother admitted that she had sent the following messages:

> Come get her now before I kill her for real because I'm about to snap.
>
> * * *
>
> I suggest you come get your daughter before I kill her a** and I would not give one f**k about going to jail for life. Jail better than dealing with this sh*t.
>
> * * *
>
> Next time you see your daughter * * * she will be in a coffin.

(Tr. 13, 15, 16-17.)

{¶ 8} Justus had confronted Mother about the messages, and Mother admitted that she had sent them to upset Father. Mother also disclosed that she was diagnosed with depression, postpartum depression, anxiety, and posttraumatic stress disorder,[3] and that the child cried a lot and that she was overwhelmed by the child. Justus noted that L.B. did not exhibit any symptoms of physical harm but did have a small bald spot, likely caused by laying down too long.

{¶ 9} Justus testified that Mother's mental health remained a concern and that the child is unable to advocate or self-protect due to the fact that she was only nine-months old and could not communicate any abuse or neglect. Justus cited the visits she observed between Mother and L.B., where Mother was constantly trying to find issues with L.B. and accused the foster family of abusing her. Justus noted that "I didn't want to turn my back for so long because I was actually afraid that [Mother] would do something and try to blame it on the foster parents, so I was very observant in these visitations." (Tr. 45.) Justus also noted that Mother continued to make threats, though they were aimed at the Father or the agency.

{¶ 10} Mother's trial counsel argued that the initial threats were made for the purpose of getting Father's attention and that there was no evidence that Mother planned to follow through with these threats.

---

[3] The initial case plan also noted that Mother reported a borderline personality disorder diagnosis. Justus clarified that later, Mother told her that her diagnosis was not borderline personality disorder but posttraumatic stress disorder and therefore amended the case plan to reflect this.

{¶ 11} CCDCFS Social Worker Zaid Hightower was assigned to Mother's case after Justus. Hightower testified that Mother was generally compliant with counseling sessions and completed her parenting courses. Mother was on a waiting list for housing and told Hightower that she had an upcoming job orientation, though Hightower did not verify her employment. Hightower testified that temporary custody was in the best interest of L.B. to allow Mother more time to interact with and engage with the case plan.

{¶ 12} The child was adjudicated dependent and remained in the temporary custody of a foster family.

{¶ 13} In June 2021, Mother moved the court to allow for unsupervised visitation, citing compliance with case plan services and consistent satisfactory visitation in a supervised setting. The agency did not object and the trial court approved the amended case plan.

{¶ 14} In September 2021, Mother filed a motion asking the trial court to terminate temporary custody of the agency and to grant legal custody of L.B. to her. In this motion, Mother argued that she attends weekly counseling with a mental health professional, has successful unsupervised visits with L.B., and has a job and appropriate housing.

{¶ 15} In October 2021, the agency filed an emergency amendment to Mother's case plan, requesting that visitation be changed from unsupervised to supervised. The agency alleged that shots were fired at Mother's home and that there was a threat of stalking. Mother objected, noting that the shooting was three

weeks ago, committed by Mother's ex-boyfriend, and that Mother is in the process of moving and obtaining a protection order against the ex-boyfriend. The trial court adopted the emergency amendment to the case plan until a full hearing could be held. At the full hearing, Mother withdrew her objections and the emergency amendment was adopted.

{¶ 16} Approximately one week later, the agency moved the court to modify temporary custody to permanent custody. The affidavit attached to the motion averred that Mother had not benefitted from parenting education; Mother was exhibiting conduct reflecting untreated mental health issues, including "belligerent and inappropriate conduct and threatening statements"; Mother refused to sign updated releases of information to allow the agency to verify her mental health treatment; Mother did not have safe and stable housing; and that Father established paternity but failed to develop a relationship with the child.

{¶ 17} A trial on all pending motions was scheduled for May 2022. Mother submitted a written motion to continue the trial so that she could obtain a mental health assessment from Able Counseling. On the date of trial, Mother's counsel made an oral motion to continue because Mother was in the hospital. The court granted the oral motion, and trial was continued to June 8, 2022.

{¶ 18} On June 8, Mother's counsel withdrew the motion for legal custody to Mother and asked for a continuance because Mother was not present. The trial court denied this continuance, citing the fact that the matter was previously continued and that Mother had advance notice of the trial.

{¶ 19} Hightower again testified on behalf of the agency. He explained that Mother received mental health services from November 2020 until November 2021, when Pipeline to God discharged Mother due to her failure to show up for appointments. Mother informed the agency that she was also getting treatment from Renaissance and Able Counseling, but the agency was unable to obtain records from these places and could not verify the treatment. The records that Hightower was able to obtain demonstrated that Mother was inconsistent with treatment and that there was a large lapse in Mother's compliance with mental health services.

{¶ 20} Mother was also referred for a psychiatric evaluation at the juvenile court, which Mother never scheduled. The court contacted Mother several times before eventually closing her out from receiving the evaluation in April 2022. Despite asking for a continuance to complete a mental health evaluation at the time of the May 2022 trial date, there is no evidence that Mother ever completed a psychiatric evaluation.

{¶ 21} Hightower noted that Mother "had outbursts" in agency meetings and during visitation, demonstrating "pent-up anger towards the foster parent or the agency" and was concerned because L.B. was present for many of these outbursts. (Tr. 26.)

{¶ 22} Mother completed all services for parenting. Mother also received two supportive visitation coaches who provided feedback and coaching during Mother's visits with L.B. Mother's first coach terminated services because Mother expressed that she was no longer interested in having a coach, even though she still had

remaining sessions. This was during the time when Mother had been granted unsupervised visitation, and she wanted alone time with L.B. About a month later, Mother was referred to a new coach with whom she completed all coaching sessions.

{¶ 23} Mother obtained housing but eventually lost it due to the above-mentioned stalking and shooting incidents. Thereafter, Mother presented to a domestic violence shelter. Hightower was unable to verify if a protection order was filed against the individual who presented a threat to Mother and L.B. At the time of the trial, Hightower was unaware of Mother's current housing situation, noting that Mother reported that she was living with friends. Mother had refused to give the agency the addresses because she figured that the agency would not deem the homes suitable or appropriate and expressed that the friends may not have wanted the agency around.

{¶ 24} Hightower testified that she did not think Mother benefited from the parenting services, citing an incident where Mother allowed a friend with a child to stay with her, and Mother was left alone with the friend's child at her home. The agency became aware of this when Mother reached out to L.B.'s foster mom for assistance soothing and calming the friend's child. Hightower noted that when he visited Mother's home, he observed alcohol bottles and drugs within reach of children, as well as food left on the floor.

{¶ 25} Mother reported that she began working at Chick-Fil-A, but never provided any requested verification. Mother also stated that she was attending

classes to obtain an STNA license, but Hightower was unable to verify whether Mother was still attending these classes at the time of trial.

{¶ 26} From August 2021 until April 2022, Mother was scheduled for 27 visitations. Mother attended about 19, and Hightower noted that Mother usually did not call ahead of time to inform the agency that she would not be attending the visits. During the visits that Hightower observed, Mother set a hostile tone. He noted that Mother was frustrated with the agency and the loss of custody, and on at least one occasion, she had a confrontation with the foster mother. She also noted that L.B. became hysterical sometimes when the foster mother handed her off to Mother, and noted that Mother focused more on bashing the foster mother than actually trying to soothe and comfort the crying child. On at least one occasion, Mother accused the foster mother of causing physical harm to L.B.

{¶ 27} Kimberly Foster, an employee at the West Side Community House, also testified. Foster testified that Mother's initial needs were housing, a mental health assessment, a place to have visitations with L.B., and "someone to continuously push her towards the things that she needed to get done." (Tr. 101.) She noted that over time, Mother became less willing to work with the collaborative to achieve these needs. She noted that she would frequently ask Mother to call or arrive early to visitation so that she could discuss portions of Mother's plan, and Mother would express understanding but then fail to show up or call. Foster notified Mother when housing became available and offered to help with the application process, but Mother never contacted her. Foster also noted that during visitations,

Mother never came prepared with bottles, toys, and other provisions, despite being told to. The collaborative attempted to set Mother up for a mental health assessment, but did not think that Mother completed it. Mother also made it difficult for her caseworker to speak to providers because she refused to sign a release of information for the collaborative. Foster described Mother's demeanor as "angry" and "combative" and that Mother constantly felt that she did not need help. Foster ultimately felt that Mother did not take advantage of the ample services that were provided to her.

{¶ 28} L.B.'s guardian ad litem recommended permanent custody to the agency and noted that L.B. is not old enough to express her own wishes.

{¶ 29} The trial court granted permanent custody to the agency. Mother appeals, assigning three errors for our review:

> I. The trial court committed reversible error by failing to continue the termination hearing.
>
> II. The trial court committed error by terminating appellant's parental rights, where R.C. 2151.414 is unconstitutional as applied to appellant and L.B.
>
> III. Appellant's counsel provided ineffective assistance in protecting appellant's fundamental rights.

## II. Law and Argument

## A. Motion for Continuance

{¶ 30} In her first assignment of error, Mother argues that the trial court erred in denying her counsel's oral motion to continue the June 8 trial. The exchange occurred as follows:

> [MOTHER'S COUNSEL]: Your Honor, just for the sake of the record I would ask for a continuance because my client is not here.
>
> THE COURT: Okay. All right. I am going to deny that request for continuance.
>
> I know that we were scheduled for trial on May 11th. At that point in time I had continued it because mother was unavailable.
>
> We will be proceeding today.
>
> Anything else?

(Tr. 6.)

{¶ 31} The decision to grant or deny a motion for continuance is left to the sound discretion of the trial judge, and an appellate court may not disturb the trial court's ruling absent an abuse of discretion. *Cleveland v. Washington*, 8th Dist. Cuyahoga Nos. 97945 and 97946, 2013-Ohio-367, ¶ 11, citing *State v. Unger*, 67 Ohio St.2d 65, 423 N.E.2d 1078 (1981). An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. Such an abuse """implies that the court's attitude is unreasonable, arbitrary or unconscionable.""" *State v. Montgomery*, Slip Opinion No. 2022-Ohio-2211, ¶ 135, quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219,

450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). This court has also summarized the pertinent juvenile and local rules as follows:

> Juv.R. 23 provides that "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties." Further, [Loc.R. 35(C)] of the Juvenile Division states: "No case will be continued on the day of trial or hearing except for good cause shown, which cause was not known to the party or counsel prior to the date of trial or hearing, and provided that the party and/or counsel have used diligence to be ready for trial and have notified or made diligent efforts to notify the opposing party or counsel as soon as he/she became aware of the necessity to request a postponement. This rule may not be waived by consent of counsel."

*In re X.R.*, 8th Dist. Cuyahoga No. 90066, 2008-Ohio-1710, ¶ 21.

{¶ 32} Pursuant to Loc.R. 35(C) of the Court of Common Pleas of Cuyahoga County, Juvenile Division, Mother was required to demonstrate good cause for continuing the trial on the date it was to commence. Mother did not provide a reason for missing the June 8 trial at the time of the oral motion.

{¶ 33} On appeal, Mother speculatively argues she could have missed the trial due to complications arising from a recent COVID-19 related illness ("perhaps she was not present due to some similar or related problem"). If Mother was suffering from COVID-19 complications or any other health emergency, Mother should have argued such or made the trial court aware of it on the date of trial or before. We find that Mother has not demonstrated good cause for missing trial at the time of the oral motion and fails to convince us otherwise now.

{¶ 34} Mother also points us to R.C. 2151.352, which states, "The parents * * * shall be entitled to * * * be present at any hearing involving the child * * * and be given reasonable notice of such hearing." Mother argues that such provision required the court to grant the continuance since Mother was not present. We do not agree. The plain text of R.C. 2151.352 indicates that the parents are entitled to be present and that they need to be given reasonable notice. The section does not mandate the parents' presence at hearings, and Mother does not point to any caselaw supporting this reading. Mother does not argue any deficiencies in notice. We therefore find that the trial court did not err in allowing trial to go forward without Mother's presence.

{¶ 35} Based on the foregoing, the trial court's ruling on Mother's continuance was not arbitrary, unreasonable, or unconscionable. We therefore overrule Mother's first assignment of error.

## B. Constitutionality of R.C. 2151.414

{¶ 36} In her second assignment of error, Mother argues that R.C. 2151.414 is unconstitutional and that the trial court erred in using this code section to terminate Mother's parental rights.

{¶ 37} Mother argues that R.C. 2151.414(B)(1)(a) "was unconstitutional as applied, where [Mother] was fit to parent and the social worker neither conducted a thorough investigation nor had the qualifications or data necessary to render opinions that resulted in termination of [Mother's] parental rights." Mother specifically maintains that the agency did not meet its burden under R.C.

2151.414(B)(1)(a) because the agency did not present any expert evidence or empirical data. Mother also argues that Hightower was the sole force driving L.B.'s removal and that L.B.'s permanent removal was the result of a personal vendetta because Mother refused to sign releases of information.

{¶ 38} We preliminarily note that an appellate court is not required to address constitutional challenges that were not raised before the trial court. *In re K.*, 8th Dist. Cuyahoga No. 83410, 2004-Ohio-4629, ¶ 13, citing *State v. Childs*, 14 Ohio St.2d 56, 236 N.E.2d 545 (1968), paragraph three of the syllabus; *State v. Awan*, 22 Ohio St.3d 120, 489 N.E.2d 277 (1986), syllabus. Mother did not raise any constitutional challenges in the trial court, but given the seriousness of the termination of parental rights, we briefly review Mother's claims.

{¶ 39} We first address Mother's contention that the agency did not meet its burden under R.C. 2151.414(B)(1)(a). R.C. 2151.414 sets forth a two-prong analysis that a juvenile court shall apply in adjudicating a motion for permanent custody. *In re N.S.*, 8th Dist. Cuyahoga No. 111486, 2022-Ohio-4088, ¶ 39. In the instant matter, Mother only contests the first prong. Under the first prong, the juvenile court must determine if any of the factors enumerated in R.C. 2151.414(B)(1)(a)-(e) apply. The trial court found that R.C. 2151.414(B)(1)(a) ("the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents") applied. R.C. 2151.414(E) lists several factors that a trial court may consider in determining whether the child cannot or should not be placed

with either parent pursuant to R.C. 2151.414(B)(1)(a). *In re A.V.*, 8th Dist. Cuyahoga No. 101391, 2014-Ohio-5348, ¶ 58.

{¶ 40} In the instant matter, the trial court made findings applicable to Mother under R.C. 2151.414(E)(1), (2), (4), (14), and (16). Only one of the enumerated factors under R.C. 2151.414(E) is required for the court to make the finding that "'the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.'" *In re L.W.*, 8th Dist. Cuyahoga No. 107708, 2019-Ohio-1343, ¶ 29, quoting *In re Glenn*, 139 Ohio App.3d 105, 113, 742 N.E.2d 1210 (8th Dist.2000).

{¶ 41} Under subsection (E)(1), the trial court found that Mother continuously and repeatedly failed to remedy the conditions causing the child to be placed outside of the home. We find that this was supported by the evidence presented. L.B. was initially removed due to concerns about Mother's mental health and her inability to care for the child. The evidence presented demonstrates that Mother was inconsistent with mental health treatment and was noncompliant with several of the agency's requests. At the outset, Mother refused to complete an emergency mental health assessment when the messages were initially investigated. Mother gradually became more compliant with the case plan's mental health services, but then became distrustful of the agency and refused to provide requested information to allow the agency to verify that she was completing and benefitting from the mental health treatment. Mother was also referred for a psychiatric evaluation that she never completed, even after being provided with additional time.

At the time of trial, Hightower was unable to verify if Mother was currently in mental health treatment, though this appears to have been due to one of Mother's providers not responding to records requests. Nonetheless, Mother failed to supply any requested information regarding her mental health treatment to the agency.

{¶ 42} Regarding parenting concerns, Mother completed the parenting classes and received a certificate. However, the individuals most familiar with Mother felt that she did not benefit from these classes because she was only sometimes prepared for visits. We also note the incident where Mother was left alone with a friend's child and could not properly care for the child.

{¶ 43} Under subsection (E)(2), the trial court found that Mother's mental illness is so severe that it makes her unable to provide an adequate permanent home for the child at present and within one year. We find that this factor is also supported by the evidence presented. Initially, Mother successfully obtained her own housing but soon after, was forced to leave for a domestic violence shelter due to an incident with an ex-boyfriend firing shots at the home. At the time of trial, Mother no longer resided at the domestic violence shelter, but instead the court noted that she was "living with friends" and refused to give the address to the agency so that it could clear the home as a suitable living environment. Evidently, Mother revealed that she refused to give the address because she suspected that the agency would not find the home suitable. We also note that Foster stated that Mother was given several resources to assist her with obtaining housing of her own, and she never followed through with them. These facts, coupled with Mother's sporadic and unverifiable

mental health treatment, demonstrate that this factor is supported by competent, credible evidence in the record.

{¶ 44} Under subsection (E)(4), the trial court found that Mother demonstrated a lack of commitment towards L.B. by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child. We find that the evidence supports this factor, as discussed pursuant to subsection (E)(2). The evidence also supports that Mother did not attend all of her scheduled visits, and sometimes did not provide a reason for missing them.

{¶ 45} Under subsection (E)(14), the trial court found that Mother was unwilling to provide food, clothing, shelter, or other basic necessities for the child or to prevent the child from suffering various abuses or neglect. We find that this factor is supported by the evidence because Mother appears unwilling to provide shelter as discussed under subsections (E)(2) and (E)(4). Hightower also indicated that she was concerned about Mother's ability to provide provisions and meet the child's needs, noting that Mother often came unprepared for visits and her preparation was very inconsistent. Finally, the agency was never able to verify Mother's employment.

{¶ 46} Under subsection (E)(16), which allows the court to address anything else it finds relevant, the trial court noted that "Mother failed to appear for today's trial." We agree that the record supports this and that Mother's failure to provide good cause for missing the trial is relevant.

{¶ 47} Mother argues that despite the evidence discussed above, the trial court's grant of permanent custody to the agency was unconstitutional as applied because the trial court did not receive any expert or empirical evidence either supporting or rebutting any of the above findings. Mother specifically argues that the initial messages causing L.B.'s removal were the product of postpartum depression and were unwanted, intrusive thoughts of intentional, infant-related harm, a known scientific symptom of postpartum depression. We do not agree that the court's finding was unconstitutional. This court has previously found that expert testimony is not required for a court to determine that a parent suffers from mental illness. *In re L.C.*, 8th Dist. Cuyahoga No. 111053, 2022-Ohio-1592, ¶ 52, citing *In re B.P.*, 8th Dist. Cuyahoga Nos. 107732 and 107735, 2019-Ohio-2919, ¶ 14; *In re E.S.*, 1st Dist. Hamilton Nos. C-100725 and C-100747, 2011-Ohio-586, ¶ 17-18, and *In re Ross*, 11th Dist. Geauga No. 2003-G-2551, 2004-Ohio-3684, ¶ 76-77. Our review of the record reflects that Mother was diagnosed with several mental health conditions. She never completed a psychiatric evaluation as referred, and the agency was not provided with any indication that Mother was complying with any proposed medication regimes. Mother also was not forthcoming with information that would allow the agency to confirm that she was regularly receiving mental health treatment and complying with the services offered. The trial court's determination that Mother is and was suffering from untreated mental health conditions is supported by competent, credible evidence in the record.

{¶ 48} Mother also alleges that Hightower's actions were the result of a personal vendetta and that Hightower sought to oppress her and treat her unfairly. Mother points to the fact that Hightower is merely a student seeking his master's degree in social work and was unqualified to make the assessments that he made. Our review of the record indicates that nothing in the record supports that Hightower had any personal vendetta against Mother. We are also mindful that "'the power of the trial court to exercise discretion is peculiarly important. The knowledge obtained through contact with and observation of the parties and through independent investigation cannot be conveyed to a reviewing court by printed record.'" *In re K.H.-T.*, 8th Dist. Cuyahoga No. 111001, 2022-Ohio-1504, ¶ 56, quoting *Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952). The trial court observed Hightower's testimony on direct and cross-examination. Hightower's experience and qualifications were conveyed to the trial court, allowing the trial court to weigh Hightower's opinions and conclusions.

{¶ 49} Further addressing Mother's concerns about Hightower's qualifications, we have already noted that expert testimony is not required. Additionally, this court has previously addressed the role of a CCDCFS caseworker's testimony pursuant to Evid.R. 701,[4] noting that "the case worker and the child protection specialist testified as lay witnesses based on their direct involvement with

---

[4] Evid.R. 701 provides: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

and observations of the parties to the case." *In re M.A.L.-C.*, 8th Dist. Cuyahoga No. 111041, 2022-Ohio-1845, ¶ 45. We find the same reasoning applies to the instant matter.

{¶ 50} Mother's second assignment of error is therefore overruled.

## C. Ineffective Assistance of Counsel

{¶ 51} In her third assignment of error, Mother argues that her trial counsel was ineffective for failing to (1) call any witness on her behalf; (2) demonstrate that Mother was working on counseling, parenting, and housing; and (3) provide an expert to rebut the idea that Mother intended to act on her threats towards L.B. All of these alleged errors are matters of trial strategy.

{¶ 52} To establish a claim of ineffective assistance of counsel, Mother must demonstrate that her trial counsel's representation was deficient and that the deficient performance was prejudicial. *In re K.*, 8th Dist. Cuyahoga No. 83410, 2004-Ohio-4629, at ¶ 17, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Weaver*, Slip Opinion No. 2022-Ohio-4371, ¶ 68. An appellant demonstrates prejudice by showing that but for trial counsel's actions, the result of the proceeding would have been different. *In re K.* at *id.*, citing *Strickland* at 694. All licensed attorneys are presumed competent and the challenged actions are presumed to reflect sound trial strategy within the range of reasonable professional assistance. *In re K.* at *id.*, citing *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989).

{¶ 53} When arguing that trial counsel's conduct was prejudicial to her, Mother speculates that employing the above strategies would have produced many outcomes other than outright termination of her parental rights. Speculation "is insufficient to demonstrate the required prejudice needed to succeed on a claim for ineffective assistance of counsel." *State v. Moon*, 8th Dist. Cuyahoga No. 93673, 2010-Ohio-4483, ¶ 9, citing *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864; *State v. Imani*, 5th Dist. Tuscarawas No. 2008 AP 06 0043, 2009-Ohio-5717; *State v. Grahek*, 8th Dist. Cuyahoga No. 81443, 2003-Ohio-2650.

{¶ 54} Reviewing the evidence, we cannot say that Mother makes a persuasive case. Assuming arguendo that Mother's threats to harm L.B. were indeed hollow, Mother still failed to consistently follow the agency's case plan; she resisted the recommendations and assistance of the many services that were made available to her and acted as a barrier to reunification with L.B. by refusing to provide necessary information relating to her mental health treatment, employment, and housing. We recognize Mother's efforts but do find that the record reflects that Mother was unwilling to comply with the agency's ultimate plan of reunification.

{¶ 55} Regarding Mother's argument that trial counsel was ineffective in failing to call witnesses on her behalf, we note that "[t]he decision to call a witness during the course of trial is a matter of trial strategy." *State v. Mallard*, 8th Dist. Cuyahoga No. 65743, 1994 Ohio App. LEXIS 2863, 11 (June 30, 1994), citing *State v. Coulter*, 75 Ohio App.3d 219, 230, 598 N.E.2d 1324 (12th Dist.1992); *State v. Hunt*, 20 Ohio App.3d 310, 312, 486 N.E.2d 108 (9th Dist.1984). As explained in

*Mallard*, Mother's trial counsel presented Mother's case via cross-examination of the state's witnesses. This is a matter of trial strategy and therefore, proper.

{¶ 56} Finally, Mother's argument that her trial counsel was ineffective for failing to call an expert is without merit. As already established herein, expert witnesses were not required to either establish or rebut that Mother was suffering from a mental illness.

{¶ 57} We therefore overrule Mother's final assignment of error.

### III. Conclusion

{¶ 58} Upon thorough review of the entire record, we find no merit in Mother's assignments of error. The juvenile court did not err in overruling Mother's date-of-trial continuance, did not err in awarding permanent custody pursuant to R.C. 2151.414, and Mother did not receive ineffective assistance of counsel at trial.

{¶ 59} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK DANIEL CELEBREZZE, III, PRESIDING JUDGE

MARY EILEEN KILBANE, J., and
EILEEN T. GALLAGHER, J., CONCUR